Anna V. SCHILLING, Plaintiff,

v.

RUTHERFORD PEDIATRICS, P.A., a North Carolina Professional Association; Willis Archer; Anita H. Powell; Gregory B. Goode; and Cynthia A. Panowicz, Defendants.

No. CIV. 1:03CV152.

United States District Court, W.D. North Carolina, Asheville Division.

Dec. 2, 2004.

Shannon M. Lovins, Dungan & Mitchell, P.A., Asheville, NC, for plaintiff.

John C. Cloninger, Cloninger, Lindsay, Hensley, Searson & Arcuri, Asheville, NC, for defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and for summary judgment pursuant to Rule 56, both of which are opposed by the Plaintiff. For the reasons stated herein, the Defendants' motion for summary judgment is granted and this action is dismissed.

### I. STANDARD OF REVIEW

Defendants move to dismiss certain claims pursuant to Rule 12(b)(6) which does not allow a court to consider matters outside the pleadings without converting the motion to one for summary judgment. Fed.R.Civ.P. 12(b)(6). Because this case has proceeded through discovery and both parties have submitted matters outside the scope of the pleadings, the undersigned will consider only the motion for summary judgment.

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra*). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of her pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered." *Id.* (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987)) (other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. PROCEDURAL HISTORY

On June 24, 2003, the Plaintiff initiated this action pursuant to 42 U.S.C. §§ 1981, 1985 and 2000e along with pendent state law claims. Complaint, filed June 24, 2003. Unfortunately, no party has placed before the Court a copy of the Plaintiff's original charge of discrimination made with the Equal Employment Opportunity Commission (EEOC). "The EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 132 (4th Cir.2002). Thus, if a complaint alleges claims which were not placed before the EEOC for an administrative review, those claims must be dismissed. *Id.; accord, Kess v. Municipal Employees*

*Credit Union of Baltimore, Inc.,* 319 F.Supp.2d 637, 644 n. 12 (D.Md.2004); *Crippen v. P. Flanigan & Sons, Inc.,* 1994 WL 146419 (D.Md.1994) (EEOC charge limited to discharge in retaliation for protected activity and race limited Title VII complaint and claims based on terms and conditions of employment could not be heard.). Although the EEOC charge was not provided to the Court, the Plaintiff states in her complaint that her EEOC charge alleged racial discrimination. Thus, to the extent that she has stated claims beyond that claim in the complaint, they will be dismissed.

The complaint alleges that on June 15, 2001, the Plaintiff entered into a one year employment contract as a licensed pediatrician with Defendant Rutherford Pediatrics, P.A. (Rutherford) Complaint, at 3. As part of the contract, Rutherford agreed that after the Plaintiff became eligible to participate in Rutherford's retirement plan, it would contribute 15 percent of her annual salary to that plan and this amount would be a minimum of $15,000 per year. *Id.,* at 3–4. The Plaintiff was to become eligible for participation after the completion of 1,000 hours of employment. *Id.,* at 4. Within a couple of months of the expiration of the one year contract, Rutherford counseled Plaintiff on the pretext of poor performance and submitted to Rutherford Hospital for its review several cases which Rutherford deemed to have been improperly handled by the Plaintiff. *Id.,* at 4–5. These actions, she claims, were taken to persuade the hospital not to grant the Plaintiff privileges and to force her to resign from employment. *Id.* In September 2002, Rutherford declined to renew the 2001 contract. *Id.,* at 9. Plaintiff claims these actions stemmed from discrimination against her based on her national origin; the Plaintiff is of Philippine origin. *Id.*

Plaintiff's complaint alleges the following causes of action: (1) discrimination on the basis of national origin, in violation of 42 U.S.C. § 1981; (2) wrongful discipline due to discrimination, in violation of § 1981; (3) conspiracy to discriminate against the Plaintiff on the basis of her national origin, in violation of §§ 1985 and 1986.(4) hostile work environment, in violation of Title VII; (5) wrongful discharge, in violation of Title VII; (6) discrimination in violation of N.C. Gen.Stat. § 143–422.1; (7) breach of contract; (8) negligence; (9) fraud; (10) libel and slander; (11) tortious interference with prospective business relations; (12) unfair and deceptive trade practices; (13) restraint of trade; and (14) civil conspiracy.

### III. FINDINGS OF FACT

The June 15, 2001, contract between the Plaintiff and Rutherford provided for a one year term of employment beginning July 9, 2001, and ending July 9, 2002. Exhibit G1, Employment Contract, *included in* Defendants' Appendix, filed August 31, 2004. The contract provided that if it were "mutually agreeable, this contract may be renewed for successive one year terms." *Id.,* ¶ 1. Either party was to provide 90 days notice if there was an intention not to renew. *Id.* In addition to a salary of $99,000 per year, the Plaintiff was to receive "the equivalent of fifteen (15) percent of her salary applied toward a tax deferred profit sharing retirement plan" after 1,000 hours of employment. *Id.,* ¶ 3. The contract also provided for termination "for cause."

> If either party shall violate any of the covenants undertaken in this Agreement such violation shall entitle the other party to terminate this Agreement provided that the party desiring to terminate for cause shall give the offending party thirty (30) days written notice specifying the particulars of the claimed violation. If

at the end of such time the party notified has not removed the cause of complaint or remedied the purported violation then termination of this Agreement shall be deemed complete.

*Id.,* ¶ 9.

During her deposition in February 2004, the Plaintiff testified that she was treated differently at Rutherford because she was an outspoken female. Exhibit B, Excerpts from the Deposition of Dr. Anna Schilling, *included in* Defendants' Appendix, at 67. "The fact that I was a female and Filipino (sic), I think they thought, again because I was Asian, that I was … going to be a head nodder and agree to everything[.]" *Id.,* at 70. Plaintiff also testified that she had a "hunch" that she was being discriminated against during her tenure at Rutherford due to her national origin. *Id.,* at 76. Plaintiff provided an affidavit in September 2004 in which she averred that another female physician at Rutherford, Dr. Cynthia Panowicz, had not liked her from the beginning of her time at the practice. Affidavit of Anna Schilling, filed September 24, 2004. "Dr. Panowicz would never be cordial or just say hello. In fact, she went out of her way to avoid speaking to me. If I had a question or needed a consultation, Dr. Panowicz would either treat me like an idiot or simply refuse to help." *Id.,* ¶ 6. Plaintiff testified that due to the personal dislike which Dr. Panowicz had of her, "Dr. Panowicz went behind my back and just colored me the way she colored me, that for whatever reason she didn't like me, and everyone based their opinions on that, instead of coming up to me and allowing me to give my side of the story." Schilling Deposition, supra, at 77. Plaintiff never complained to anyone at Rutherford that she was being discriminated against because

[a]gain, it was only suspicion, and I didn't feel it was right to bring it up because I couldn't prove it but I did express to Dr. Archer many times that I felt Dr. Panowicz was very condescending towards me. I felt like I wasn't being treated as a colleague, that I was being treated more as a worker underneath her or as a resident, and so I made the comment that I felt that I didn't appreciate being treated like a resident, you know, because a resident, it's known in the medical field, is a scut monkey, and so that's how I felt I was being treated, instead of being somebody, you know, like one on one, like we're both doctors, and let's treat each other like that.

*Id.*, at 82. Despite acknowledging that her allegations of discrimination were based only on a "hunch," the Plaintiff testified that the only physician at Rutherford who discriminated against her was Dr. Panowicz. *Id.*, at 84.

The Plaintiff testified that early in her relationship with Rutherford, she began to request information about retirement contributions and other financial information so that she could make an informed decision about whether she would like to buy into the practice at the end of her one year employment contract. In May 2002, the Plaintiff requested a meeting with the supervising physicians at Rutherford to discuss contract renewal and the possibility of buying into the practice. *Id.*, at 84–85. Plaintiff also acknowledged that she was not sure she wanted to buy into the practice due to some reservations about the fact that Drs. Archer and Powell were considering going to a part-time practice. *Id.*, at 88. She advised Dr. Archer that she was not comfortable buying into the practice until some period of time after a new physician, Dr. DeLaGarza, had come into the practice. *Id.* Plaintiff felt that Drs. Archer and Powell were the strongest

members of the group. *Id.*, at 89. She never felt comfortable with Dr. Panowicz and, although she liked Dr. Goode, he was consistently late getting to work in the morning. *Id.* As a result, the Plaintiff would see his patients because she "felt bad for" them and thus, ended up seeing more patients than he did. *Id.* She was also bothered that the bonus pay was divided equally among the doctors when she felt she worked harder than Dr. Goode. *Id.*, at 90. So, Plaintiff started asked for "numbers" to see how many patients each doctor was seeing. *Id.* Plaintiff did not feel that Drs. Panowicz and Goode would be "very good potential business partners." *Id.*, at 91. Plaintiff also heard from former patients who did not like the Rutherford group because Dr. Goode was late and Dr. Panowicz was "condescending; she was not very nice." *Id.*, at 91–92.

Two days prior to the meeting which the Plaintiff had requested, Dr. Archer advised her that some of her cases would be discussed during the meeting. *Id.*, at 86. Dr. Archer left the files for the patients in question on her desk in a folder marked "Cases that Raised Questions." *Id.*, at 87. This angered the Plaintiff because a nurse coming into her office could have seen the folder. *Id.* The Plaintiff also testified that prior to the meeting, Dr. Archer had submitted these cases to Rutherford Hospital for their review and, as a result, the hospital determined to continue her provisional privileges instead of granting her full active privileges. *Id.*, at 99–100.

Plaintiff testified that of the four cases involved, Dr. Archer had questioned her previously about only one of them. *Id.*, at 103. He stopped her in the hallway at work and asked her about the case of a child treated by the Plaintiff in the emergency room for severe abdominal pain and dehydration. *Id.* Plaintiff felt that when

she examined the child, she could not make an adequate diagnosis because the child had been given pain medication which masked the symptoms. *Id.*, at 104. A surgical consultant had opined that the child did not need surgery; however, Plaintiff determined to admit the child for observation and ordered that no food or liquid be given by mouth. *Id.*, at 105. She also ordered that intravenous liquids be given for the dehydration and in writing the order, she wrote 50 ccs per kilo instead of 10 ccs per kilo. *Id.*, at 106. "[I]t's not that I didn't know what the correct dosage is, but for whatever reason, I know it was late that night, I was tired, I had seen patients all day, I accidentally wrote 50 ccs per kilo." *Id.* Plaintiff insisted that later that night she realized she made a mistake and called the hospital. *Id.*, at 107. She acknowledges, however, that someone at the hospital, probably a nurse, caught the mistake and had the order corrected before she called. *Id.* The other three cases were also discussed during the May 2002 meeting.

At the end of the meeting, Dr. Archer asked the Plaintiff if she wanted to renew her contract for another year. *Id.*, at 123. However, the Plaintiff was very angry that these cases had been discussed and requested instead that she be given a three month contract so that she could decide whether she wanted to stay with the group. *Id.* Plaintiff also acknowledged that before this meeting she had already contacted an attorney. *Id.*, at 123–24. Plaintiff was proffered a contract for three months of employment by Dr. Archer which she signed without reading. *Id.*, at 151, 155. Plaintiff testified that pursuant to that contract, if either party gave three months notice, the contract was terminated without any liability. *Id.*, at 163. She also acknowledged that applied as equally to Rutherford as to her. *Id.*

The Plaintiff testified that during the May meeting, she had made it clear to the other physicians that she did not want to buy into the practice. *Id.*, at 263. In fact, the day before the May meeting, the Plaintiff had expressed this opinion to Dr. Powell. *Id.* She asked if she could just be an employee and not actually buy into the practice. *Id.* At the meeting the next day, the physicians offered to allow her to do just that by extending her contract for another year. *Id.* Plaintiff referred to this offer as a "stunt" and at the meeting asked for a three month extension which, in fact, Rutherford later offered. *Id.*

There was a hole in the wall in the Plaintiff's office at Rutherford which she requested be fixed. *Id.*, at 228. Because it was never repaired, the Plaintiff considered that she was being treated differently from other physicians. *Id.*

Plaintiff testified that she had looked forward to Dr. DeLaGarza coming into the practice because she thought the two of them would be friends. *Id.*, at 229. However, once he came into the practice in July 2002, the two never worked together. *Id.*

Dr. Panowicz testified that during either September or October 2001, she became uncomfortable with the quality of care the Plaintiff was providing to patients. Excerpts from the Deposition of Dr. Cynthia Panowicz, filed September 24, 2004, at 22–23. This was prompted when Dr. Panowicz, who was on call for the day, noticed a child in the office in obvious severe abdominal pain whom the Plaintiff was going to send home instead of for a surgical consult. *Id.* Dr. Panowicz asked if she could examine the child and upon doing so, diagnosed appendicitis and sent the child to the hospital. *Id.* This happened a second time with a patient normally seen by Dr. Goode. *Id.*, at 24. Dr. Panowicz admitted that she did not like the Plaintiff. *Id.*, at 32. She

testified that the Plaintiff frequently complained that the Plaintiff saw more patients than Dr. Panowicz and Dr. Goode. *Id.*

Dr. Archer testified that in December 2001, the Plaintiff discussed with both he and Dr. Panowicz whether the vesting requirement for the retirement plan could be shortened. Exhibit E, Excerpts from the Deposition of Dr. Willis Archer, *included in* Defendants' Appendix, at 30–31. She was not the first physician to request this; however, the practice had not been willing to do so on the advice of its plan administrator. *Id.* When the Plaintiff asked about this, Dr. Archer gave her business cards with the names and telephone numbers of the administrators and other persons who managed the business aspects of the practice and encouraged her to make direct contact. *Id.* Dr. Archer also testified that the child with appendicitis whose diagnosis was missed by the Plaintiff was actually referred to a surgeon and had his appendix removed. Excerpts from the Deposition of Dr. Willis Archer, filed September 24, 2004, at 108. About six weeks later, a child was seen by the Plaintiff for abdominal pain and sent home. *Id.* The next day, the child was brought in again and Dr. Goode saw the child, diagnosed a ruptured appendix and referred the child to surgery. *Id.* The surgeon opined that at the time the Plaintiff had seen the child, the appendix had already ruptured but she did not make that diagnosis. *Id.*, at 108–09. On both occasions, the Plaintiff was advised about these problems. *Id.* On the second occasion, after Dr. Goode spoke with the Plaintiff, she was upset and spoke to Dr. Archer directly. *Id.* Dr. Archer testified that the May 2001 meeting was set up, not at the Plaintiff's request to discuss her contract, but in fact to discuss concerns regarding her performance. *Id.*, at 140.

Prior to the expiration of the three month contract of employment, the Plaintiff notified Rutherford that she was taking a leave of absence from the practice of medicine. Exhibit G17, Letter, dated September 6, 2002, from Schilling to Rutherford, *included in* Defendants' Appendix. The Plaintiff provided no advance notice of this leave nor did she request permission to take such leave. *Id.*

Dr. Bonner Baker is involved with the credentialing of physicians for Rutherford Hospital. Excerpts from the Deposition of Dr. Bonner Baker, filed September 24, 2004, at 15–16. In early May 2001, Dr. Archer reported to Dr. Baker that he had some concerns about the Plaintiff's performance in the office. *Id.* Dr. Archer advised that when the Plaintiff had been hired, it had been made clear that Drs. Archer and Powell wanted to be on call less than the other physicians in the group. *Id.*, 16–17. After the Plaintiff came on board, however, she objected to this and Drs. Archer and Powell were unable to cut back on the time they were on call. *Id.* Dr. Archer was also concerned because the Plaintiff did not seem dedicated to the practice; she was very concerned with getting out of the office on time so that she could help her husband who had just opened an ice cream shop. *Id.* As a result, he was of the opinion that she rushed through her patients in order to leave the office on time. *Id.* When Dr. Baker advised that this had no impact on her performance in the hospital, Dr. Archer also expressed concern over the quality of care being provided. *Id.*, at 17–18. Dr. Baker then noted that a peer review had not been performed and asked Dr. Archer to provide any cases for review by the credentialing committee. *Id.* Dr. Archer did so and subsequently appeared before that committee. *Id.* When Dr. Baker asked Dr. Archer if his concerns had been discussed with the Plaintiff, Dr. Archer ad-

vised that he had done so, but the Plaintiff was not very receptive to constructive criticism. *Id.* When Dr. Archer appeared before the committee, he recommended that the Plaintiff's provisional privileges be extended for another year instead of granting full privileges; however, this did not in any manner limit her ability to practice medicine. *Id.,* at 38. The Plaintiff was given an opportunity to appear, and did appear, before the medical executive committee of the hospital and her provisional privileges were renewed for a 12–month period. Exhibit D, Excerpts from the Deposition of Dr. Bonner Baker, *included in* Defendants' Appendix, at 131.

At a later time after the Plaintiff and Rutherford had parted ways, the Plaintiff advised the hospital that she wanted to have Class C rather than Class A hospital privileges, although she did have active privileges. Baker Deposition Excerpts, filed September 24, 2004, at 43. The reason was that she did not want to be called into the hospital to attend high risk deliveries. *Id.* After the Plaintiff had initiated this lawsuit against Rutherford, she asked Dr. DeLaGarza to provide a pediatric consultation about one of her patients. *Id.,* at 52–53. The consultation was declined because of the lawsuit. *Id.* Dr. Baker testified it is unusual to request a consult within the same specialty; consultations are usually requested from a different specialty. *Id.*

At some point after the Plaintiff was no longer working at Rutherford, a nurse named J'Anmetra Hatton overheard a conversation between Dr. Panowicz and Jeff Archer, the son of Dr. Archer, who functioned as an office manager for the practice. Excerpts from the Deposition of J'Anmetra Waddell Hatton, filed September 24, 2004, at 30. Jeff Archer advised Dr. Panowicz that resumes had been received for physicians who were applying for the position vacated by the Plaintiff. *Id.* Hatton heard Dr. Panowicz say that she did not want any more of the Plaintiff's "kind ..., we don't want any more Filipino (sic), Vietnamese, we don't want any more of her kind here, any more like that." *Id.* Jeff Archer agreed. *Id.* That was the first and only time during her employment that Hatton heard anyone referred to according to their national origin. *Id.,* at 39.

## IV. DISCUSSION

### A. Plaintiff's claims pursuant to 42 U.S.C. §§ 1981, 1985 and 1986

The first cause of action in the complaint alleges a violation of 42 U.S.C. § 1981 by discrimination against the Plaintiff based on her national origin. Complaint, at 10–11. The second claim alleges a violation of the same statute by wrongful discipline based on national origin. *Id.* The third cause of action alleges a conspiracy to discriminate against the Plaintiff based on her national origin. *Id.,* at 12. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The reference to the same rights as enjoyed by "white citizens" does not protect, under this statute, against discrimination on the basis of gender, religion, disability, age, political affiliation or national origin. *Sagana v. Tenorio,* 384 F.3d 731, 738–39 (9th Cir.2004) (citing *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)); *Saad v. Baltimore Life Ins. Co.,* 47 Fed.Appx. 228, 232 (4th Cir.2002) (§ 1981 does not provide protection for "individuals discriminated against on the basis of national origin.").

Because the first three claims allege violations of §§ 1981, 1985 and 1986 based on national origin, each must be dismissed.

### B. Plaintiff's claims pursuant to Title VII

■ Unlike § 1981, Title VII specifies the types of discrimination prohibited by the statute as including race, color, religion, sex and national origin. *Sagana*, 384 F.3d at 738 n. 5. Plaintiff's fourth cause of action alleges a hostile work environment based on discriminatory animus due to her national origin; *i.e.*, Philipino. In order to establish a *prima facie* case, she must show (1) she was subjected to unwelcome conduct; (2) which was based on her national origin; (3) which was sufficiently pervasive or severe to alter the conditions of her employment and to create a hostile work environment; and (4) there is a basis for imputing this conduct to the employer. *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 331 (4th Cir.2003), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1411, 158 L.Ed.2d 77 (2004); *Khoury v. Meserve*, 268 F.Supp.2d 600, 612 (D.Md.2003), *aff'd*, 85 Fed.Appx. 960 (4th Cir.2004) (based on national origin).

■ Plaintiff claims Rutherford's failure to make retirement contributions on her behalf shows that she was subjected to unwelcome conduct based on national origin. However, her employment contract provided that she was entitled to such contributions only after working 1,000 hours, or 25 weeks. And, Dr. Archer testified that there was a vesting requirement for this benefit. Plaintiff has neither alleged nor shown that the same requirements were not imposed on every other physician, including Dr. DeLaGarza who was hired while she still worked at Rutherford. *Id.*, at 613 ("This circumstantial evidence, however, is insufficient to support a reasonable inference that, but for Plain-

tiff's membership in a protected class, she would not have been subjected to the entire pattern of treatment she claims constituted a hostile work environment.").

Next, Plaintiff argues that Rutherford failed to allow her to buy into the practice, thus showing discrimination. However, the undisputed evidence, including the Plaintiff's own testimony, is that she advised Rutherford she did not want to buy into the practice. Likewise, while she claims Rutherford failed to renew her contract, it is undisputed, again by her own testimony, that she asked for a three month contract instead of a renewal and during that three month term, notified Rutherford that she was taking a leave of absence.

Although the Plaintiff believes that Dr. Archer intentionally tried to reduce her hospital privileges, there is no evidence that he did anything other than what was ethically required of him. In fact, after discussing the Plaintiff's cases with Dr. Baker, Rutherford nonetheless offered to extend her contract for another year and did contract for a three month period with her. Thus, Dr. Archer's conduct does not "both reflect directly the alleged discriminatory attitude and [ ] bear directly on the contested employment decision." *E.E.O.C. v. Warfield–Rohr Casket Co., Inc.*, 364 F.3d 160, 163 (4th Cir.2004); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir.2004). While the Plaintiff claims that she was "forced" to accept Class A privileges as a result of his conduct, the testimony of unbiased individuals is that it was the Plaintiff who requested Class A privileges. And, Dr. Baker testified that although Plaintiff remained on provisional privileges, this status in no manner impacted her ability to practice medicine or earn a living.

Plaintiff had a "hunch" that Dr. Panowicz was prejudiced against her because she

was Filipino. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir.), *cert. denied,* —— U.S. ——, 125 S.Ct. 423, —— L.Ed.2d —— (2004); *Bryant,* 288 F.3d at 134–35 (subjective beliefs and unsupported speculation insufficient to defeat summary judgment). It was a "feeling" that she had; nonetheless, she admitted that no one else at the practice ever discriminated against her or caused her to feel discriminated against by their conduct or statements. "Title VII is not a federal guarantee of refinement and sophistication in the workplace—in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Hartsell v. Duplex Prod., Inc.,* 123 F.3d 766, 773 (4th Cir.1997).

Finally, the Plaintiff points to the alleged comment by Dr. Panowicz that Rutherford did not need "any more of her kind" as evidence of prejudice, claiming that the comment contained a direct reference to her national origin. The comment, assuming *arguendo* that it was made, could have been a reference to the Plaintiff's educational background or her perceived lack of competence due to training in a different country. As such, it is an inherently ambiguous statement. *Weston–Smith v. Cooley Dickinson Hosp., Inc.,* 282 F.3d 60, 65 (1st Cir.2002); *King v. Rumsfeld,* 328 F.3d 145, 151 (4th Cir.), *cert. denied,* 540 U.S. 1073, 124 S.Ct. 922, 157 L.Ed.2d 742 (2003) (Finding the following comment did not establish discriminatory prejudice: "That's what you people always say when you screw up[.]"). Besides the fact that Dr. Panowicz was not in a position alone to terminate the Plaintiff, this comment was made after the Plaintiff herself had determined not to join the practice. Statements which are unrelated to the decisional process itself do not suffice to satisfy the burden of proving discrimination. *Hill, supra; Taylor v. Virginia*

*Union Univ.,* 193 F.3d 219, 232 (4th Cir. 1999) (Supervisor's comment to co-worker that "he was never going to send a female to the [Police] Academy" while proof of discriminatory attitude against women, did not bear directly on the contested employment decision; thus, mixed-motive standard of reviewed not triggered.); *Williams v. New York City Police Dep't,* 1997 WL 557296 (S.D.N.Y.1997) (Supervisor's persistent requests to discuss Hitler with black female officer not discrimination).

In short, the Plaintiff has completely failed to show a sufficiently pervasive environment to make out a *prima facie* case. *Mezu v. Morgan State Univ.,* 264 F.Supp.2d 292, 296 (D.Md.), *aff'd,* 75 Fed. Appx. 910 (4th Cir.2003) (citing *Carter v. Ball,* 33 F.3d 450, 461 (4th Cir.1994)).

■■■■■ Plaintiff's fifth cause of action is for wrongful discharge in violation of Title VII.

To establish a *prima facie* case of racial discrimination ... under Title VII, [Plaintiff] must show that: (1)[she] is a member of a protected class; (2)[she] was qualified for [her] job and [her] job performance was satisfactory; (3)[she] was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. Under the now familiar *McDonnell Douglas* tripartite burden-shifting framework, if [Plaintiff] succeeds in proving a *prima facie* case, the burden of going forward shifts to [Defendants], the employer, who must then articulate a non-discriminatory reason for the difference in treatment. Should [Defendants] articulate a non-discriminatory reason, the burden then shifts back to [Plaintiff] to demonstrate that [their] reasons were not true, but instead were merely a pretext for discrimination.

*Bryant,* 288 F.3d at 133 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (other internal citations and footnote omitted). Again, the Plaintiff cannot establish a *prima facie* case because her own testimony establishes that she was not fired. She unequivocally told Rutherford that she did not want to be a partner in the practice, merely an employee. Rutherford offered her a one year contract of employment. She then changed her mind a second time and advised that she did not want to work for another year, only for three months. Rutherford offered her a three month contract of employment. The Plaintiff then abruptly took a leave of absence without permission. The Plaintiff's own testimony defeats her claim.

In her complaint, the Plaintiff alleged as well that she was terminated because of her national origin; however, the Defendants made this termination appear to be a voluntary resignation of her position. Plaintiff claims she was forced to sign the three month contract under duress after she told the Defendants that she intended to stay another year as an employee. Again, the Plaintiff's deposition testimony belies the claims made in her complaint. She testified that beginning as early as October 2001, she was ambivalent about buying into the practice due to the fact that Drs. Archer and Powell intended to reduce their time in the practice. *See,* Exhibit B, Excerpts from Schilling Deposition, *supra,* at 86–88. She admitted she told Drs. Archer and Powell that she did not want to buy into the practice. *Id.,* at 88–89, 263. And, in fact, the most she wanted from the Defendants was a one year renewal of her contract. *Id.* Although the complaint alleges the Plaintiff was forced to sign the three month contract, she testified that she requested the three month extension, no longer wanting to remain in the practice for an additional

year. *Id.,* at 123, 142, 169. It is also undisputed that after the Defendants offered this three month contract, the Plaintiff terminated it unilaterally. *Id.,* at 181. The undersigned does not find, on this record, that the Plaintiff has made out a *prima facie* case of constructive discharge.

**C. Title VII claims against the individual Defendants**

Title VII precludes a plaintiff from stating a claim against any defendant not named as a respondent in an EEOC charge. Here, according to the right to sue letter and the language of the complaint, the Plaintiff's EEOC charge named only Rutherford. *Onan v. County of Roanoke, Va.,* 52 F.3d 321 (table), 1995 WL 234290 *2 (4th Cir.1995). As a result, any claims pursuant to Title VII against Drs. Archer, Powell, Goode and Panowicz must be dismissed.

**D. State law claims**

Having dismissed each claim over which this Court has original jurisdiction, the undersigned declines to exercise jurisdiction over the remaining state law claims.

**V. ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendants' motion to dismiss is hereby **DENIED** as moot, and;

**IT IS FURTHER ORDERED** that the Plaintiff's motion to compel is **DENIED** as moot, and;

**IT IS FURTHER ORDERED** that the Plaintiff's requests for hearings on her motion to compel and the Defendants' motions to dismiss and for summary judgment are **DENIED;** and

**IT IS FURTHER ORDERED** that the Defendants' motion for summary judgment

is hereby GRANTED. A Judgment dismissing this action is filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Defendants' motion for summary judgment is **ALLOWED**, and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.