**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOHN C. HONOR, JR.,

       *Plaintiff-Appellant,*

v.

BOOZ-ALLEN & HAMILTON,
INCORPORATED,

       *Defendant-Appellee.*

No. 03-2076

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-03-32-A)

Argued: June 2, 2004

Decided: September 2, 2004

Before WIDENER and WILLIAMS, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

---

Affirmed by published opinion. Senior Judge Beezer wrote the opinion, in which Judge Widener and Judge Williams joined.

---

## COUNSEL

**ARGUED:** Peter Charles Cohen, CHARLSON BREDEHOFT, P.C., Reston, Virginia, for Appellant. Everett Clifford Johnson, Jr., LATHAM & WATKINS, Washington, D.C., for Appellee. **ON**

**BRIEF:** Elaine Charlson Bredehoft, CHARLSON BREDEHOFT, P.C., Reston, Virginia, for Appellant. Stephen W. Robinson, MCGUIREWOODS, L.L.P., McLean, Virginia, for Appellee.

## OPINION

BEEZER, Senior Circuit Judge:

Appellee Booz-Allen & Hamilton, Inc. ("Booz Allen") employed appellant John C. Honor, Jr. as its Director of Human Resources, Worldwide Technology Business ("WTB"), in September 2000. During the course of his employment, Honor's compensation increased from $235,000 per year to $250,000 per year. On January 15, 2002, Honor accepted an offer for a position with US Airways. He submitted a letter of resignation to Booz Allen on January 31, 2002.

We consider the circumstances of Honor's employment and departure from Booz Allen, including whether Honor's departure was voluntary.

## I

Booz Allen employed a Director of Recruiting and a Director of Diversity. Honor claims that Booz Allen directed him, in part, to increase diversity at Booz Allen, particularly the number of African-Americans in senior level positions. Honor alleges that Booz Allen did not support his efforts to accomplish these goals and that colleagues actively undermined these efforts.

Jean Callahan, the Senior Director of Recruiting, was allegedly one such colleague. Callahan and Honor were in separate departments; neither had any supervisory or managerial power over the other. Honor alleges that Callahan's bias against African-Americans resulted in the disparate treatment of African-American employees and recruits and created a hostile work environment for Honor.

Honor claims that he complained about Callahan's discriminatory behavior to a number of partners and principals to no avail.

According to Honor, on November 16, 2001, C.G. Appleby, Booz Allen's General Counsel, told him, "you are going to lose your job." [JA 261.] Honor met with Appleby again on November 19, 2001; this time, Sam Strickland, Vice President of Operations at WTB and Honor's direct supervisor, also was present. Honor claims that Strickland and Appleby refused to talk about Callahan's and Honor's strained relationship: "[W]e don't want to talk about Jean because we all agree that Jean has relationship problems, but we want to try to make you successful, John. We want you to be successful, and we just don't think that you can continue in your current role." [JA 67.] At this same meeting Strickland encouraged Honor to explore other opportunities at the firm, including consulting. [JA 69, 261.] Honor believes that this meeting started the process of terminating his employment.

During the fall of 2001, Booz Allen was involved in an unrelated management restructuring, in addition to being concerned about Honor's tumultuous relationship with Callahan.

In September or October of 2001, Booz Allen decided to integrate within one department the human resource functions of WTB and that of Worldwide Commercial Business ("WCB"), another of Booz Allen's business units. Booz Allen created the position of Chief Human Resources Officer (CHRO) to oversee the entirety of the company's human resources operations. The CHRO position required prior WCB client-service experience. Booz Allen gave the new CHRO position to Horacio Rozanski, the then-Vice President and Chief Human Resources Officer of WCB. Rosanski accepted his expanded position in November 2001.

Booz Allen's integration rendered Honor's position largely superfluous. At the November 19, 2001 meeting discussed above, Honor maintains that Appleby and Strickland told him that "[his] job as director, Human Resources Services, at Booz Allen Hamilton, Inc. would not be continued in its current form." [J.A. 74.]

Ten days later, on November 29, 2001, Honor spoke to a group of off-site training leaders in New York and there he announced that he was leaving Booz Allen. [J.A. 269.]

On December, 17, 2001, Rozanski and Strickland sent an email to "Worldwide HR Staff" entitled "HR Organization in Transition." The email explained generally Booz Allen's goals of integration and announced the newly-structured Human Resources Leadership Team. Honor was not listed in any capacity. After listing the various positions, the email stated the following: "Please note that the role of Director — HR Services has yet to be filled. . . . We will be talking about this with the HR Services team in the near future." [J.A. 556.] Rozanski explains that he did not consider Honor for that position because Rozanski belived Honor would no longer be working at Booz Allen.

On December 20, 2001, Honor received a proposed consulting agreement that offered him his full salary and benefits through January 31, 2002, and a six-month consulting contract, which did not include health or other benefits, conditioned upon his resignation as Director of Human Resources on January 31, 2002 and waiver of his right to file suit against Booz Allen.

Prior to this offer, on December 2, 2001, Honor emailed Gil Griffen, a headhunter, to obtain assistance with "the job search" Honor had initiated. [J.A. 189.] That email stated the following regarding Honor's circumstances at Booz Allen:

> I decided to initiate this search after deciding to change my relationship with my employer, Booz Allen, for irresolvable ethical reasons on which I cannot compromise.
>
> . . .
>
> Also, note that I have neither terminated my employment nor informed the firm of my intent to do so. When I advised my supervisor that I could not in good conscience continue as Director of HR for the firm, I was asked to consider alternatives such as consulting for the firm or as an external consultant to the firm. In the spirit of 'not burning bridges,' I agreed to consider any options they wanted to present. Nonetheless, after many discussions with my wife of 34 plus years, and many friends and professional colleagues, I have

concluded that it is appropriate for me to sever my relationship with the firm entirely.

[J.A. 189.]

On January 14, 2002, US Airways offered Honor the position of Vice President-Human Resources and Development. [J.A. 185.] The next day, Honor faxed the Senior Vice President of Human Resources at US Airways, accepted the company's offer and stated, "I will notify my current employer, Booz-Allen & Hamilton, Inc. . . . of my decision to resign my employment." [J.A. 184.] On January 16, 2002, Honor informed Strickland via voice mail and e-mail of his decision to resign effective January 31, 2002. [J.A. 183.] On January 31, 2003, Honor tendered a self-titled "Letter of Resignation." [J.A. 192.]

Honor filed an action against Booz Allen in the Circuit Court of Fairfax County on December 12, 2002. Booz Allen removed the action to United States District Court for the Eastern District of Virginia on January 13, 2003. Following the district court's dismissal of certain of Honor's claims, Honor filed an Amended Complaint on March 11, 2003, alleging claims of wrongful termination, retaliation, failure to promote and hostile work environment. On August 26, 2003, the district court granted Booz Allen's motion for summary judgment on all claims.

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291, and review a district court's grant of summary judgment *de novo*. *See United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir.1997). The moving party must demonstrate the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). Once the moving party discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). We consider the facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. *See Anderson*, 477 U.S. at 247-48.

## III

The issue at the heart of Honor's wrongful termination and retaliation claims is whether he was terminated by Booz Allen or resigned voluntarily. We begin our analysis with that issue.

### A.

An employee may show that he was discharged by direct or circumstantial evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003); *United States Postal Serv. v. Service Bd. of Gov.*, 460 U.S. 711, 714 n.3 (1983). The words "fired" or "terminated" need not be used by an employer to constitute actual termination. *See EEOC v. Service News Co.*, 898 F.2d 958, 962 (4th Cir. 1990).

In this case, Honor bases his claim of termination on the following: (1) his November 16, 2001 meeting with Appleby in which Appleby allegedly told Honor that he was going to be fired; (2) his November 19, 2001 meeting with Strickland and Appleby, in which they allegedly told Honor that he could not continue in his current position and that his position would cease to exist in its current form; and (3) the terms of the December 20, 2001 consulting agreement he received from Booz Allen.

The record indicates that Honor and Booz Allen both were concerned with the strained professional and personal relationship between Honor and Callahan. The record also indicates that Honor's frustration over internal professional relationships caused him to seek other employment on numerous occasions and, ultimately, to resign voluntarily from Booz Allen.

As early as June 2001, Honor was speaking with various prospective employers about alternative employment, including US Airways, Children's Hospital, Archer Daniels Midland, America Airlines, and the Nature Conservatory. The following email to US Airways on July

11, 2001 makes clear the deliberate and voluntary nature of Honor's resignation:

> About six to eight weeks ago, after consultation with a number of trusted friends and associates, my wife and I decided we would move on with our lives wiyh [sic] my putting the Booz-Allen work experience behind me. Accordingly, I initiated a 'confidential' job search that is beginning to bear fruit.
>
> . . .
>
> I am committed to stay with Booz-Allen until September 5, and intend to keep my commitment despite the unfortunate circumstances that have led to my decision.
>
> . . .
>
> I have a definite interest in joining your team.

[J.A. 190.][1]

Honor concedes that he at one time considered leaving Booz Allen, but claims he later changed his mind. He relies on an October 17, 2001 letter to Strickland detailing Honor's lack of satisfaction with his situation at Booz Allen for support:

> As early, [sic] as January 2001, I predicted these issues would somehow be shifted to become my responsibility. After weighing this possibility, and consulting with numerous people, I was persuaded to remain with the Firm and continue to do my best. I continue to be committed to giving the Firm all that I have . . . .

[J.A. 244.] To the extent Honor offers this letter as evidence of his commitment to Booz Allen as of January 2001, his position is under-

---

[1]September 5, 2001 was Honor's one-year anniversary with Booz Allen.

mined by his efforts to obtain alternative employment, including his July 11, 2001 email to US Airways. To the extent Honor offers it to show his recommitment to Booz Allen as of the date of October 17th, his commitment is similarly belied.

Indeed, Honor sought other employment subsequent to this October, 17, 2001 letter—and before the various meetings Honor claims constituted his termination. On November 12, 2001, Honor had an interview with the National Football League; on December 2, 2002, Honor interviewed with the law firm of Wilmer, Cutler & Pickering. December 2, 2002 also was the date Honor emailed his headhunter, Gil Griffen.

Furthermore, prior to receiving the consulting agreement on December 20, 2001, which Honor maintains was the first tangible evidence of his termination, Honor announced his resignation to the off-site training leaders on November 29, 2001.

Honor eventually received an offer from US Airways, which he accepted on January 14, 2002. His departing phone message, email and written correspondence all referred to his departure as a "resignation."

Based on the above undisputed evidence, a reasonable jury only could find that Honor voluntarily resigned his employment at Booz Allen.

## B.

Honor argues in the alternative that even if he was not actually terminated, he can nonetheless establish a *prima facie* case of wrongful termination because Booz Allen forced him to resign, *i.e.*, he was constructively discharged.

An employee is entitled to relief absent a formal discharge, "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995) (internal quotation marks and citations omitted). To demonstrate constructive discharge

in this case, Honor must allege and prove two elements: (1) the deliberateness of Booz Allen's actions, motivated by racial bias, and (2) the objective intolerability of the working conditions.[2] *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir.2001); *Brown v. Eckerd Drugs, Inc.*, 663 F.2d 1268, 1272 (4th Cir. 1981), *judgment vacated on other grounds*, 457 U.S. 1128 (1982).

"Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined." *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989). Although demotion can in some cases constitute a constructive discharge, we hold that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

As an initial matter, Honor's working conditions cannot reasonably be described as intolerable. Honor's complaints revolve around disagreements with Callahan and others about the mission and functioning of Booz Allen's HR department. Honor states that the work environment at Booz Allen was the "most miserable [ ] and professionally unfulfilling of his life." [J.A. 236.]

There is no question that Honor's workplace was filled with professional and, in some cases, personal tensions. The HR department did not operate in a manner Honor considered acceptable and he viewed

---

[2]As we explained in *Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1993):

> An employee may not be unreasonably sensitive to his working environment. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

Callahan as the central obstacle. But Honor's mere frustration with his inability to accomplish his professional goals does not constitute an intolerable work condition for the purposes of establishing a constructive discharge. *See*, *e.g.*, *Williams*, 370 F.3d at 434 (not intolerable working condition where "supervisors yelled at employee, told her she was a poor manager, gave her poor performance evaluations, chastised her in front of customers, and once required her to work with an injured back"); *Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997)(evidence that employee was ignored by coworkers and top management was insufficient to establish constructive discharge); *cf. Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) (issue of fact as to intolerability of work conditions where supervisor and others subjected employee to daily epithets about his Iranian origin and tried to embarrass him in public, resulting in an ulcer and his eventual resignation).

Even if Honor could show that the conditions at Booz Allen were intolerable, there is no evidence that Booz Allen deliberately created these conditions to pressure Honor to resign. Honor's complaints revolve around the conduct of Callahan. As noted, Callahan was not Honor's "employer"; she wielded no supervisory or managerial power over Honor.

Honor's superiors' only actions were to discuss with Honor his future at Booz Allen in light of the professional tensions that existed and the impending integration of the Human Resources department. There is no evidence, direct or circumstantial, that Appleby's or Strickland's statements or the consulting agreement they offered were part of "a calculated effort to pressure [Honor] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." *James v. Booz Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)). Although Honor's motivation to look for alternative employment may have been based on his impression of his future prospects at Booz Allen, there is no evidence that those conditions were intentionally created to force Honor out because of race or otherwise.

Finally, beyond all of this, as discussed above, Honor did not part from Booz Allen under circumstances that a reasonable jury could

find that he was forced to resign. His search for other employment and his resignation announcement, email, phone call and letter foreclose any contrary conclusion. *See Taylor*, 93 F.3d at 238.

We conclude that a reasonable jury could not find that Honor was constructively discharged.

We now turn to Honor's individual causes of action.

## IV

The district court properly rejected Honor's claim that Booz Allen wrongfully terminated him on the basis of race in violation of 42 U.S.C. § 1981.

To establish a *prima facie* case Honor must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133, 133 n.7 (4th Cir. 2002); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir. 1998).

Honor was not terminated. A reasonable jury could not conclude that Honor established a *prima facie* case of wrongful termination.

## V

The district court properly rejected Honor's claim that Booz Allen retaliated against him in violation of 42 U.S.C. § 1981.

To establish a *prima facie* retaliation claim, Honor must produce evidence from which a reasonable jury could find (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). Adverse employment actions include any retaliatory act or harassment if that act or harassment results in an adverse effect on the terms, conditions,

or benefits of employment. *Von Gunten v. Maryland*, 243 F.3d 858, 865-68 (4th Cir. 2001)(citing *Munday*, 126 F.3d at 242). "Once the plaintiff makes this case, the employer can defend itself by producing 'evidence of a legitimate, non-discriminatory reason for taking the adverse employment action.'" *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

The district court found that Honor experienced no adverse employment action and granted summary judgment for Booz Allen on that basis. Our careful review of the record in this case does not support any of Honor's allegations of retaliation. Although Honor alleges several actions in response to his complaints of discrimination in Booz Allen's hiring process, none constitutes an adverse action, as a matter of law.

Honor first claims retaliation based on his alleged firing and the fact that Booz Allen did not promote him to the position of CHRO or any other available position. Honor voluntarily resigned from Booz Allen. The record discusses that the only position that represented a promotion for Honor was that of CHRO. Honor did not meet the necessary qualifications for that position. Although failure to promote can constitute an adverse employment action for the purposes of a retaliation claim under certain circumstances, *Von Gunten*, 243 F.3d at 865-66, it does not here. Honor was not qualified for the promotion and there is no evidence of discrimination in Booz Allen's decision. *Cf. Bryant*, 333 F.3d at 544 (inference of retaliation reasonable where there was no real reason to deny employee the promotion).

Honor's next allegation is that he suffered an adverse employment action by being excluded from certain meetings and emails. Honor refers to a meeting on January 10, 2002, and emails on December 17, 2001 and January 10, 2002. We observe according to Honor's own statements that both emails and the meeting occurred after Honor announced his resignation on November 29, 2001. The claimed lack of communication could not have had a negative effect on terms, conditions, or benefits of Honors employment. The omissions do not constitute adverse employment actions.

Honor's remaining allegations involve a negative employment evaluation he received and the fact that he was ostracized by certain

employees. Neither claim rises to the level of an adverse employment action. The activity of other employees did not adversely affect the terms, conditions, or benefits of Honor's employment. *See Von Gunten*, 243 F.3d at 864-66; *see also Munday v. Waste Management, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity.").

## VI

The district court properly granted summary judgment for Booz Allen on Honor's claim of failure to promote on the basis of race.

To establish a *prima facie* case of failure to promote on the basis of race, Honor must establish that he (1) is a member of a protected class; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir. 1995). An employer may rebut a *prima facie* case by demonstrating that the person promoted was better-qualified for the position. *Id.* The employee can then attempt to prove that the employer's articulated reason for promoting the successful applicant was pretextual. *Id.*

Honor concedes that the only position to which his selection would have constituted a promotion was that of CHRO. He asserts that he informally expressed interest in the CHRO position in October 2001. Booz Allen filled the CHRO position with Horacio Rozanski, the then-Chief Human Resources Officer for Booz Allen's WCB. Rozanski is a Hispanic-American.

Honor produces no evidence demonstrating that Booz Allen's proffered reasons for selecting Rozanski were pretextual. Booz Allen asserts that Rozanski's prior client services with WCB made him a superior candidate. Honor admits that he did not possess such experience. He does not establish that Booz Allen's crediting of Rozanski's experience in that area was a pretext for discrimination. *See O'Connor v. Consolidated Coin Caterers Corp.*, 84 F.3d 718, 719 (4th Cir. 1996).

## VII

The district court properly granted summary judgment on Honor's hostile environment claim.

To demonstrate a racially-hostile work environment, Honor must show that he was the subject of conduct that was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). The district court found that the conduct about which Honor complained was not motivated by Honor's race and, in any case, was not sufficiently severe or pervasive to alter his condition employment or create an abusive atmosphere.

Honor's hostile work environment claim is based largely on his assertions that Callahan is biased against African-Americans and sought to undermine the careers of other African-Americans at Booz Allen as well as Honor's efforts to recruit additional African-American employees. Honor also cites the general culture at Booz Allen as one that tolerates discrimination, contains a glass ceiling for African-Americans and refuses to implement change.

However, there is no evidence in the record, nor does Honor allege, that Callahan or anyone else directed any racially-offensive conduct at Honor himself. Honor makes much of the treatment of other Booz Allen employees, but we focus on Honor's personal experience. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998) ("[A]n individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance."), *vacated on other grounds*, 527 U.S. 1031 (1999); *Childress v. City of Richmond*, 907 F. Supp. 934, 940 (E.D.Va. 1995), *aff'd in part*, 134 F.3d 1205 (4th Cir. 1998) (en banc), *cert. denied*, 524 U.S. 927 (1998); *see also Schrand v. Federal Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988) (citing *Haskell v. Kaman Corp.*, 743 F.2d 113, 121-22 (2d Cir. 1984) (holding that testimony by other employees regarding their terminations was irrelevant and prejudicial).

At oral argument, Honor's counsel directed us to an October 17, 2001 letter Honor wrote to Strickland. The letter is Honor's response to a critical competency assessment he received and, according to counsel, inventories the complaints that make up Honor's hostile work environment claim.

The letter discusses the "friction" between Honor and Callahan, including her "litany of lies, innuendos, and personal attacks," as well as her "personal integrity . . . , veracity" and "value system with exhibited dysfunctional behaviors." [J.A. 247.] According to Honor, one Booz Allen employee referred to Callahan as "[t]he most evil person I have ever met." [J.A. 238.] Honor also explains that his situation with Callahan is the first time in his career he has experienced "personal relationship issues."

Even if a jury believed that Honor's complaints evince some hostility towards his recruiting agenda and/or him personally, there is nothing in his letter or the record to support the notion that this hostility was generated on account of Honor's race. Although Honor makes a general reference to the "years of U.S. history regarding the killing and character assassinations of thousands of men of African descent because of ill motivated Caucasian females," [J.A. 239], Honor concedes that "no one in the Booz Allen workplace used racial epithets, racially derogatory terms, or demeaning racial characteristics, or stereotypes with respect to him or any other persons, in his presence." [J.A. 125.] At most, the record contains a hearsay statement that Callahan once stated in reference to Honor that, "she didn't know how to work with an African-American male." Assuming this statement is accurate, and that Honor was aware of it prior to this litigation, it is not "sufficiently severe and pervasive" to create an objectively abusive atmosphere. *See Spriggs*, 242 F.3d at 184 (examining the frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or mere offensive utterance and whether it unreasonably interferes with employee's work performance).

Like his constructive discharge claim, Honor's hostile work environment claim fails because it is based on professional frustrations, not personal racial attacks. A reasonable jury could not find that Honor was subject to a racially-hostile work environment at Booz Allen.

*AFFIRMED*