**Cheryl CLARK, Plaintiff,**

v.

**THI OF SOUTH CAROLINA AT MONCKS CORNER, LLC, d/b/a Magnolia Manor–Moncks Corner, Trans Health Management, Inc., and Magnolia Manor–Moncks Corner, Inc., Defendants.**

**C.A. No. 2:05–3445–PMD.**

United States District Court,
D. South Carolina,
Charleston Division.

Nov. 2, 2007.

Jarrel L. Wigger, Wigger Law Firm, North Charleston, SC, for Plaintiff.

Christina M. Summer, Jim O. Stuckey, II, Littler Mendelson, Columbia, SC, for Defendants.

### ORDER

PATRICK MICHAEL DUFFY, District Judge.

This matter is before the court upon two Motions for Summary Judgment, one filed by Defendant THI of South Carolina at Moncks Corner, LLC, d/b/a Magnolia Manor–Moncks Corner ("THI") and another filed by Trans Health Management, Inc. ("Trans Health"). For the reasons set forth herein, the court grants in part and denies in part the motions filed by THI and Trans Health.

### BACKGROUND

The facts of this case, considered in the light most favorable to the non-moving party, are as follows:

Plaintiff Cheryl Clark ("Plaintiff" or "Clark"), a black female, began working as an employee with Defendants as a social worker at Magnolia Manor in Moncks Corner, South Carolina, in 1998. She was later promoted to the Director of Social Services at Magnolia Manor.

OPPOSITION ACTIVITY

On March 24, 2004, Clark faxed a complaint about the amount of her raise to corporate headquarters. On June 3, 2004, another complaint was faxed complaining of a disciplinary action taken against her for failing to complete a patient assessment. On March 5, 2005, Clark faxed a complaint because she was told to "hang onto" a resident's grievance pending an investigation. None of these complaints alleged any racial element. Her final complaint to corporate was made after she was fired.

Additionally, Clark, along with two other black employees named Jenkins and Sumpter, made three anonymous complaints about corporate widespread unfairness to black employees. Clark faxed complaints dated August 24, 2004, and September 2, 2004, to the corporate headquarters of Trans Health, but she does not remember when the third complaint was faxed. The complaints alleged preferential treatment of white employees at Magnolia Manor. All three complaints were sent

anonymously by Clark, but they did include the names of the black employees who were allegedly treated unfairly. Clark, however, was not mentioned in any of these three complaints.

On March 29, 2005, Trans Health's Human Resources Director Cindy Hamm and another Human Resources employee named Karen Hood came to Moncks Corner to investigate the anonymous complaints. (Hamm Dep. 27:22–29:18; Cully Dep. 28:8–29:1.) Hamm and Hood interviewed several employees including Vivian Jenkins and Priscilla Sumpter who reported to Hamm and Hood that they had "witnessed many racial issues at the facility." (See Sumpter Aff. at 1.) Clark was out of the office during the two-day investigation, and Jenkins and Sumpter told Hamm and Hood that they needed to speak with Clark as she was "involved" in the complaints. (Jenkins Aff. at 1; Sumpter Aff. at 1.) Clark was not interviewed, and Hamm and Hood found no cause to believe the complaints.

Clark relies on these three anonymous complaints and the subsequent investigation to establish that she engaged in protected opposition activity of which the defendants knew.

## THE TERMINATION

The event giving rise to Plaintiff's termination occurred on April 1, 2005. Around lunchtime of that day, which was a Friday, a resident's daughter told Plaintiff that her mother had been abused the previous day by a black nursing assistant named Helen Marion. Upon receiving this complaint, at about 2 p.m. that same day, Plaintiff filled out a grievance report and put copies of the report in the boxes of the Director of Nursing, Sally Cully; Assistant Director of Nursing, Donna Longto; and the Administrator, Neil Ivey. By that time, both Cully and Ivey had left the facility for a long weekend and did not return until Tuesday,

April 5, 2005. Clark knew that Cully and Ivey were already gone when she put the grievance in their boxes. (Clark Dep. 77:21–78:15.) Although Clark testified at her deposition that she had seen Longto at the facility earlier in the day, she did not remember whether Longto was at the facility after she placed the grievance in Longto's box. Clark admits that she did not check to see if Longto received this grievance. (Clark Dep. 77:17–79:11.)

No action was taken in response to Clark's grievance report until Ivey found it in his box on Tuesday, April 5, 2005. He called Cully, who had not yet come across the grievance, and Longto, who told Ivey that she had no knowledge of the complaint. At his deposition, Ivey stated that he called Clark and asked for a full report of what she knew about the alleged abuse. He also asked her if she thought she should have reported the complaint, and Clark told him that she should have immediately reported the abuse. (Ivey Dep. 21:1–21:20.) Ivey conferred with Cindy Hamm and his regional director at THI, and they decided that Clark would be terminated. Ivey then told Clark that she was fired for failing to report the abuse allegations to him immediately. (Clark. Dep.103:4–103:13; Ivey Dep. 21:18–21:20.)

Clark complained that her termination was unfair because she followed the only procedure she had been taught. At her deposition, she explained that she followed what she understood to be the proper abuse reporting procedure. According to Clark, that procedure would be to write up a report and place it in Ivey's box as well as either (1) the Director of Nursing, Sally Cully's box or (2) the Assistant Director of Nursing, Donna Longto's box. (Ivey Dep. 16:4–16:23; Clark Dep. 67:18–68:5, 184:5–187:21.) However, she stated at her deposition that she was aware the facility had received citations in the past from state

authorities for failing to report various issues within the time frames set by state laws and regulations. (Clark Dep. 58:5–58:17.) Clark acknowledges that the procedure for reporting abuse allegations may have changed but that when such information was disseminated at Magnolia Manor, she was on her day off and neither Ivey nor anyone else informed her of the change. She also complained that Longto knew about the allegation and did not report it either. As previously noted, when Ivey initially confronted Longto about the abuse allegation, she initially stated that she had no knowledge of it. Longto subsequently admitted that she lied and that she had independent knowledge of the abuse allegation on that Friday but did not report it to anyone.[1] Longto then tried to resign, but Ivey consulted with Hamm and, as a result of the conversation, he rejected her resignation and fired her instead. Although the alleged abuser, Helen Marion, was suspended during the investigation, she was not ultimately fired. Clark, however, was replaced by a white male. (Ivey Dep. 33:14–33:19.)

At his deposition, Ivey stated that he does not necessarily keep regular hours at the facility. While he stated that he never made any other person his designee for purposes of reporting abuse allegations, he also stated that Longto would have been the proper person to report such allegations to when he and Cully were not on site. Longto agreed that she was the proper person to report the abuse allegation to DHEC when Cully was not available. (Longto Dep. 9:4–9:10.) Ivey also deposed that if Clark had told Longto about the alleged abuse, that would have discharged Clark's duty to immediately report abuse allegations. (Ivey Dep. 16:11–16:22.) He further stated in his deposition that putting the grievance in his box was not enough—Clark should have called him on his cell phone. According to Ivey, all department heads had his phone numbers. (Ivey Dep. 54:10–54:23.) Clark, however, who is a department head, denied that she had ever been instructed to call Ivey or his designee and denied that she had Ivey's phone number. (Clark Dep. 103:1–103:13.)

As noted, Clark thought she had done just what she was required to do and what she had always done in the past. (Clark Dep. 186:5–187:21.) While she acknowledged that the rule for reporting abuse allegations may have changed, she denied being aware of any such change. Clark deposed that she was unsure whether she had seen the written policy before she was fired, but Hamm stated that such written policy did exist.[2] Clark and Longto were the only employees discharged during Ivey's tenure at the facility for not properly reporting abuse allegations. (Ivey Dep. 55:4–55:9.)

Hamm and Hood conducted on-site investigations into complaints of racial discrimination made by black employees of Magnolia Manor. Hamm and Hood concluded that there was no racial discrimination in the first two investigations, but as a result of the third investigation, Hamm

---

1. Longto eventually admitted that when she came into work on the morning of April 1, 2005, the resident's call light was on, so she went to the resident who in turn told Longto what happened. (Clark Dep. 84:19–85:2.) Longto made no attempt to report the abuse allegation to the Administrator or the Director of Nursing. Instead she spoke with the nurse on duty, Annette Smith, who told Longto that she also had been told by the resident about the incident. Longto reassigned Helen Marion away from the resident and told nurse Smith to "keep an eye on Helen to see how she talks or treats other residents." (Clark Dep. 84:19–85:18.)

2. Ivey's deposition provides evidence that there was a written policy for reporting abuse allegations, but it is not clear from his deposition that he knew about it.

reported to Ivey's regional manager that "the building was a racial time bomb," and Ivey was given an "action plan." Ivey disagreed with the report of the investigation and resigned during the first week of May 2005. (Ivey Dep. 56:6–58:5.) [3]

## CLARK'S LAWSUIT AND THE R & R

Clark filed suit on December 9, 2005, listing four causes of action: (1) wrongful termination on account of race in violation of Title VII and 42 U.S.C. § 1981, (2) illegal discharge in retaliation for her having engaged in an activity protected by Title VII, (3) hostile work environment on account of race, and (4) wrongful termination in violation of the public policy of South Carolina. (*See* Compl.) On March 15, 2007, both THI and Trans Health filed Motions for Summary Judgment, and on May 9, 2007, a hearing on the motions was held before Magistrate Judge Carr. On July 16, 2007, Judge Carr issued a Report and Recommendation ("R & R") that recommended finding that Defendant Trans Health be an employer subject to this court's jurisdiction and that the Motions for Summary Judgment be granted except Plaintiff's cause of action alleging racially discriminatory termination. (R & R at 28.)

With respect to her first cause of action, which alleged wrongful termination on account of race, the Magistrate Judge examined her claim under the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). He stated in the R & R,

> Under *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination by proving that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the action, she was performing at a level that met [her] employer's legitimate job expectations; and (4) her position remained open or was filled by a similarly qualified applicant outside the protected class.
>
> If this burden is met, a rebuttable presumption of discrimination then arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decision.
>
> If the employer does so, the ultimate burden falls on the plaintiff to establish that the legitimate reasons offered by the defendant were not its reasons, but a pretext for discrimination.

(R & R at 18–19 (internal quotation marks and citations omitted).) The Magistrate Judge determined that summary judgment was not appropriate on this cause of action; he determined that Clark had established a *prima facie* case of discrimination. (R & R at 19–20.) While he noted that the Defendants "set forth an alleged legitimate non-pretextual reason for the termination," that Clark did not properly report the abuse allegation, "Clark has produced enough evidence to allow a reasonable fact finder to conclude that the defendants' reason is pretextual and that the real reason for the firing was race based animus." (R & R at 20.) The Magistrate Judge stated,

> Taken in the proper light Clark has shown that she reported in the correct way; that if the procedure had changed, neither Ivey, Cully, or anyone else, had discharged their duty to inform her of the change; that although Ivey claimed Clark had his cell phone number; she had never been provided with the number, that there was no written policy on reporting of which Clark or Ivey knew; that Ivey's explanation of her firing did

---

**3.** Ivey deposed that the action plan may or may not have included issues regarding race relations. (Ivey Dep. 59:11–59:14.)

not match the official reason as reflected in the memo written by Ivey and Hamm, and that all this occurred in an atmosphere described by Hamm in a report to Ivey's regional manager as a "racial time bomb."

(R & R at 20–21.)[4]

The Magistrate Judge recommended granting the Motions for Summary Judgment on the remaining three claims. With respect to Plaintiff's retaliation claim, the Magistrate Judge stated that to establish a prima facie case of retaliation, Plaintiff must prove: (1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action. (R & R at 21.) He determined that Plaintiff failed to establish that she engaged in protected opposition activity, as she "merely assisted in sending anonymous complaints to the defendant about how others, some explicitly named, were being subjected to racial discrimination." (R & R at 24.) The Magistrate Judge also determined that because Plaintiff's complaints were anonymous, "it cannot be said that the defendant knew of her opposition activity, and without evidence of the employer's requisite knowledge, plaintiff cannot bear her burden to establish that she engaged in protected activity or the element of causation." (R & R at 24–25.)

Plaintiff's third cause of action alleges that she was subjected to a hostile work environment on account of race. The Magistrate Judge stated,

To demonstrate a hostile work environment prohibited by Title VII, Plaintiff

Clark must prove that she was the subject of conduct that was: (1) unwelcome; (2) based on her race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer.

(R & R at 25.) He determined that Defendants are entitled to summary judgment on this cause of action, stating, "[A]side from generally averring that she is black and that her supervisor and other white upper management treats whites differently, Plaintiff offers absolutely no facts to support a causal connection between the alleged hostile environment and her race." (R & R at 26.)

Plaintiff's final cause of action is for wrongful termination in violation of the public policy of South Carolina. Noting that Plaintiff complained of being terminated in violation of two federal statutes (Title VII and 42 U.S.C. § 1981) and one state statute (the South Carolina Human Affairs Law, S.C. CODE § 1–13–80), the Magistrate Judge recommended granting summary judgment because "statutory remedies available in the form of her Title VII and § 1981 causes of action preclude this common law cause of action under the law of South Carolina." (R & R at 28.)

Defendants filed timely Objections to the R & R on July 31, 2007, and Plaintiff filed a response to these Objections on August 24, 2007.

### STANDARD OF REVIEW

**A. Magistrate Judge's R & R**

 This court is charged with conducting a *de novo* review of any portion of the

---

4. The Magistrate Judge noted that the Defendants pointed to Longto's firing and argued that it negated any inference of race discrimination. The Magistrate Judge stated, however, that Longto "is not a similarly situated white employee. She failed to report the alle-

gation at all and lied to management about it when confronted, whereas Clark was fired although she attempted to report it, and was honest about everything from the beginning." (R & R at 21.)

Magistrate Judge's R & R to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that R & R. 28 U.S.C. § 636(b)(1). After a review of the entire record and the R & R, as well as objections filed by Defendants and Plaintiff's response to those objections, the court finds the Magistrate Judge applied the correct principles of law. However, due to some errors in the Magistrate Judge's assessment of the facts of the case, the court modifies the R & R.

**B. Summary Judgment**

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate."

*Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

**ANALYSIS**

Defendants makes several objections to the R & R. The court will address each objection in turn.[5]

**1. Objection: The Magistrate Judge used the wrong legal test to determine whether Clark established a *prima facie* case of discriminatory discharge.**

■ As previously noted, the Magistrate Judge articulated the test regarding

---

5. In Plaintiff's Response to Defendants' Objections, Plaintiff seems to argue the Magistrate Judge erred in recommending granting the Motions for Summary Judgment with respect to Plaintiff's claims of retaliation and hostile work environment. The Plaintiff did not make a specific objection, however, and in any event, the court finds the Magistrate Judge properly recommended granting summary judgment on these two claims. The complaints Plaintiff did not send anonymously did not contain any allegations that Plaintiff was treated differently due to her race, and the complaints Plaintiff sent anonymously did not mention her name at all. Thus, Plaintiff is not able to establish she reasonably engaged in opposition activity or that there was a causal link between such activity and the adverse employment action. Furthermore, Plaintiff is unable to establish a causal connection between the alleged hostile environment and her race. The court thus finds the Magistrate Judge properly recommended granting Defendants' Motion for Summary Judgment with respect to Plaintiff's retaliation and hostile work environment claims.

establishing a *prima facie* case of wrongful discharge on account of race as follows:

> Under *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination by proving that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the action, she was performing at a level that met [her] employer's legitimate job expectations; and (4) her position remained open or was filled by a similarly qualified applicant outside the protected class.

(R & R at 18.) According to Defendants, this test is not the proper one and "incorrectly placed the ultimate burden of persuasion on Defendants." (Objections at 3.) Defendants state,

> The Magistrate Judge held Clark established element four of her *prima facie* case of race discrimination by showing she was replaced with a person outside her protected class. Neither party argued that replacement by a person outside the protected class was the showing Clark must make to establish her *prima facie* case. In fact, Clark merely stated the *McDonnell Douglas* framework was the appropriate analysis for her case without setting out the elements of a *prima facie* case. Defendants, on the other hand, cited *Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180 (4th Cir.2004) for the proper elements of a *prima facie* case of discriminatory discharge, which are: (1) plaintiff is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met Defendants' legitimate job expectations; and (4) other employees who are not members of the protected class were

retained under apparently similar circumstances. *Id.* at 188.

(Objections at 3–4.)

Fourth Circuit opinions have stated the test differently. For example, in the 2003 opinion of *King v. Rumsfeld*, 328 F.3d 145 (4th Cir.2003), the Fourth Circuit stated,

> To establish a prima facie case of discriminatory discharge, King must show: (1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class.

*King*, 328 F.3d at 149; *see also Pettis v. House of Ruth Md., Inc.*, 144 Fed.Appx. 313, 316 (4th Cir.2005). In a 2004 opinion, however, the Fourth Circuit articulated the test differently:

> To establish a *prima facie* case [of wrongful termination on the basis of race,] Honor must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances.

*Honor*, 383 F.3d at 188. The difference appears only with respect to the fourth element. In the case sub judice, if the court uses the test as stated by the Magistrate Judge and the Fourth Circuit in King, Plaintiff has presented evidence that she satisfies that element, as she has presented evidence that her position was filled by a white male. However, if the court uses the test urged by Defendants, Plaintiff must also produce evidence that other employees who are not members of the

protected class were retained under apparently similar circumstances. According to Defendants, "Clark has failed to identify any similarly situated employee outside the protected class who failed to report abuse immediately to the Administrator." (Objections at 4.)

In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court granted certiorari "to determine whether, in a suit against an employer alleging intentional racial discrimination in violation of § 703(a)(1) of Title VII of the Civil Rights Act of 1964, . . . the trier of fact's rejection of the employer's asserted reasons for its actions mandates a finding for the plaintiff." *St. Mary's*, 509 U.S. at 504, 113 S.Ct. 2742. The Court stated that Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part that it shall be " 'an unlawful employment practice for an employer—(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . .' " *Id.* at 505, 113 S.Ct. 2742 (quoting 42 U.S.C. § 2000e–2(a)). Although there was no disagreement in that case about whether a *prima facie* case was established, the Court stated,

> Petitioners do not challenge the District Court's finding that respondent satisfied the minimal requirements of such a prima facie case (set out in *McDonnell Douglas . . .*) by proving (1) that he is black, (2) that he was qualified for the position of shift commander, (3) that he was demoted from that position and ultimately discharged, and (4) that the position remained open and was ultimately filled by a white man.

*Id.* at 506, 113 S.Ct. 2742. Thus, in the context of allegations that the plaintiff was demoted and then discharged because of his race, the Supreme Court articulated the test just as the Magistrate Judge did in the case *sub judice.*

■ As previously noted, the test as enunciated in *Honor* did list the fourth element as requiring Plaintiff to prove that other employees who are not members of the protected class were retained under apparently similar circumstances. *See Honor*, 383 F.3d at 188. This articulation of the test has appeared when the claim is one of racial discrimination in the enforcement of employee disciplinary measures. *See, e.g., Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir.2002). However, other courts specifically refer to this element in the context of wrongful termination claims. *See, e.g., Schilling v. Rutherford Pediatrics, P.A.*, 346 F.Supp.2d 828, 838 (W.D.N.C.2004); *McElveen v. CSX Transp., Inc.*, No. 4:95–1632–22JI, 1996 WL 481105, at *6 (D.S.C. Aug.21, 1996) ("To establish a prima facie case of discriminatory discharge under § 1981, Plaintiff must establish: (1) that he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to the misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against Plaintiff were more severe than those enforced against other employees."). Several other district courts enunciate the test in the same manner as the Magistrate Judge. *See Woodard v. N.C. Dept. of Transp.*, No. 3:06CV264–H, 2007 WL 2682765, at *6 (W.D.N.C. Sept.7, 2007); *Davis v. American Soc'y of Civil Eng'rs*, 330 F.Supp.2d 647, 655 (E.D.Va.2004); *Taylor v. Cummins Atl., Inc.*, 852 F.Supp. 1279, 1284 (D.S.C.1994) (noting that in order to establish a *prima facie* case of age discrimination under Title VII, the plaintiff had to show that "(1) he is age 40 or older, (2) he was discharged, (3) at the time of the discharge he was performing his job at a level that met defendant's legitimate ex-

pectations, and (4) following his discharge, he was replaced by someone of comparable qualifications under the age of forty").

Although the Fourth Circuit opinions vary, the court finds that the Magistrate Judge properly articulated the test for establishing a *prima facie* case of wrongful termination on the basis of race, as this test is the one described by the Supreme Court in *St. Mary's*. The Magistrate Judge thus committed no error.[6]

**2. Objection: The Magistrate Judge erroneously relied on irrelevant, immaterial, and unsupported factual assertions in concluding that a genuine issue of fact existed as to whether Defendants' asserted reason for terminating Clark was a pretext for race discrimination.**

Defendants first assert the Magistrate Judge "erroneously relied on a memorandum describing the reason Defendants terminated Assistant Director of Nursing *Donna Longto* as evidence of inconsistency in the legitimate, nondiscriminatory reason Defendants asserted for terminating *Clark.*" (Objections at 2.) The Magistrate Judge did refer to Plaintiff's Exhibit J in referring to Plaintiff's termination, which in fact was a notice regarding the reason for terminating Donna Longto. (*See* R & R at 14.) According to Defendants, "[n]o inconsistencies exist in the reason given by Defendants for Clark's discharge ..." (Ob-

jections at 6.) To the extent the Magistrate Judge determined that there were inconsistencies in the reason given regarding Clark's termination, the court finds such a determination was erroneous.

■ Defendants next assert that the Magistrate Judge erroneously determined the Defendants did not have a written policy requiring abuse to be reported to the Administrator immediately. (Objections at 2.) According to Defendants, Clark testified at her deposition that she was aware of a reporting policy. (Objections at 7.) Defendants point to this exchange at Clark's deposition:

Q. All right. Miss Clark, we've now handed you Defendants' Exhibit 10. Have you seen this before?

A. Yes, I think I have.

Q. When did you see this?

A. I—I really don't recall. Maybe at the facility, but I've seen this piece of paper before.

Q. All right. Do you believe you saw it before you were terminated?

A. To be honest with you, no.

Q. You don't remember—

A. Hum-um.

Q. —or no, you're sure you didn't see it?

A. No, I don't remember. I can't say I'm sure I didn't see it.

---

**6.** Plaintiff asserts that even if she must produce evidence that other employees who are not members of the protected class were retained under apparently similar circumstances, she has done just that. Plaintiff deposed that in 2004, the Assistant Director of Nursing, a white employee, was accused of being verbally abusive. (Clark Dep. 52:23–52:25.) Plaintiff prepared a report of abuse, but the allegation was not resolved immediately because Plaintiff was told to put the grievance aside. (Clark Dep. 53:16–55:25.) It appears that the Director of Nursing, a white employee, was also aware of the com-

plaint, as Ms. Cully completed a witness statement. (Clark Dep. 53:22–53:25.) According to Plaintiff, Ms. Cully "did not forward the complaint up, actually put the complaint in a separate location from the other complaints, covered up the report, and didn't even get reprimanded much less fired." (Pl.'s Reply to Objections at 11.) On reviewing the pieces of Clark's deposition available to the court, it is not clear whether Ms. Cully failed to report the abuse internally or externally, but Clark deposed that Cully failed to follow the policy regarding reporting abuse allegations and was not fired.

Q. Okay. Let me ask you to read it and tell me whether this was your understanding of the leadership standards of practice, abuse, neglect and misappropriation of property policy.

. . .

A. Okay. All alleged violations concerning abuse, neglect or misappropriation of property are reported immediately to the Administrator/Designee and other enforcement agencies, according to state law including the State Survey and Certification Agency (nurse aide registry or licensing authorities). . . .

Q. So did you understand that to be the policy at Magnolia Manor when you were there?

A. Yes and then no.

Q. What—what causes you to say yes and then no?

A. Well, I need to say yes, because when they say report it immediately, I reported it immediately when I put it in the mailbox. As to the time frame—well, I need to say yes. Yes. You report it immediately and that's what I did, because I—I did it the way I always did; so yeah.

(Clark Dep. 184:5–186:11.) While Defendants assert this testimony reveals that Clark admitted to the existence of a *written* reporting policy, the court disagrees with that assessment of her deposition testimony. She said she had seen the piece of paper before but did not know whether she had seen it before she was terminated. Furthermore, the policy she described in that testimony does not state how she must report the abuse immediately; it merely states that she must report it immediately, and according to Clark, she did

follow that policy. Thus, even assuming Clark knew of the existence of a written policy, there is evidence in the record that she followed such policy.[7]

Defendants also assert that contrary to the Magistrate Judge's statement, Ivey's deposition confirmed the existence of a written policy. (Objections at 7.) Based on a review of the portions of Ivey's deposition in the record, it appears Defendants are correct. The deposition refers to an affidavit, and although it is unclear who authored that affidavit, the affidavit states that a "true and accurate copy" of Magnolia Manor's abuse reporting policy is attached to the affidavit as Exhibit 2. (Ivey Dep. 37:9–37:18.) When asked whether he had "a true and accurate copy of the reporting policy," he replied in the affirmative. (Ivey Dep. 37:20–37:22.)

Cindy Hamm's unsigned affidavit also indicates that Magnolia Manor had a written policy regarding abuse allegations; she indicated that pursuant to this policy, "employees must report abuse allegations to the administrator of their facility or their facility's designated abuse coordinator immediately." (Hamm Aff. ¶ 6.) However, even assuming that Magnolia Manor had a written policy requiring abuse allegations to be reported immediately, there is conflicting evidence in the record regarding what constitutes "immediately." Clark deposed that placing the grievance in the appropriate box was what she had always done to immediately report an abuse allegation, but Ivey indicated such action did not comply with Magnolia Manor's policy.

Defendants next argue that the Magistrate Judge erroneously relied on Clark's

7. Magnolia Manor apparently did have a written policy concerning reporting abuse allegations. The policy states, "All alleged violations concerning abuse, neglect, or misappropriation of property are reported **immediately** to the Administrator/Designee and other enforcement agencies, according to state law including the State Survey and Certification Agency (nurse aide registry or licensing authorities)." (Mem. in Opp'n Ex. M.)

assertion that if the procedure changed, no one had discharged their duty to inform her of the change. Defendants assert that Clark failed to offer any evidence "other than her own conjecture—for her suspicion that the policy requiring immediate reporting to the Administrator had been affected by a change in the policy requiring the facility to report to DHEC." (Objections at 8.) Defendants ask this court to take judicial notice that the abuse reporting regulations did not change in 2005. (*Id.*) However, the court need not examine whether abuse reporting regulations changed during Clark's employment at Magnolia Manor. Clark acknowledged that she had a duty to report abuse allegations immediately, but she also presented evidence that she did just that. The court therefore need not base its decision on any change (or lack thereof) in the abuse reporting regulations.

■ Defendants also argue the Magistrate Judge erroneously attributed significance to the atmosphere described by Hamm in a report to Ivey's regional manager as a "racial time bomb." Defendants' objection seems to be that this statement was made concerning an investigation that occurred after Clark was terminated. (Objections at 8.) The following exchange occurred at Ivey's deposition:

Q. Do you recall Cindy Hamm and Karen Hood coming to the facility to do an investigation?

A. I do.

Q. And were you made aware of what that investigation was regarding?

A. I was.

Q. Okay. And what was the nature of that investigation?

A. To find out if there was any tensions amongst the staff.

Q. Tensions regarding racial issues?

A. I'm not exactly sure what precipitated those investigations, Jerry.

Q. Ms. Hamm didn't talk to you about it?

A. After the fact the—there were three occasions they came in. First two occasions came up with nothing. The third occasion she thought the building was a racial time bomb, but in each instance she told me that she had no issues with the building, so I had two conflicting reports there.

Q. What's the timeframe on those investigations?

A. There were two, I believe, during '04. I can't tell you what those dates were. The last was after this incident with Ms. Clark, I believe, maybe the third week of April.

Q. Okay. Is it fair to say it was close in time with when Ms. Clark was terminated?

A. It is.

(Ivey Dep. 56:6–57:10.) Defendants also assert that the statement calling Magnolia Manor a "racial time bomb" is inadmissible hearsay, as Ivey heard the statement from his regional manager who was not deposed in the case. (Objections at 9 n. 5.)

The court need not rely on this statement, however, as there is other evidence in the record of the racial problems at Magnolia Manor. Ms. Hamm acknowledged that several employees of Magnolia Manor related to her their belief that racial discrimination occurred at Magnolia Manor. (Hamm Dep. 28:20–29:18.) Furthermore, Clark presented evidence that Ms. Cully, a white employee, was not fired for failing to follow policy regarding reporting an abuse allegation but Plaintiff, a black employee, was fired for that reason. A memorandum from the "African American Employees" of Magnolia Manor to THI's Human Resources department further details allegations of racial discrimination. (*See* Pl.'s Mem. in Opp'n Ex. E.) In addition, regardless what Ms. Hamm determined concerning the allegations of ra-

cial discrimination, the allegations were sufficiently serious to warrant an on-site investigation at Magnolia Manor. Thus, even disregarding the comment allegedly made by Ms. Hamm that Magnolia Manor was a "racial time bomb," there is evidence in the record of racial tensions at Magnolia Manor. Any reliance on such statement was therefore harmless, as the court determines summary judgment is not appropriate even disregarding that statement.

### 3. Objection: The Magistrate Judge erroneously substituted his judgment for that of the Defendants.

Defendants state, "In contravention of the law as stated by the Fourth Circuit and other federal courts, the Magistrate Judge's Report and Recommendation reflects that he believes Clark's conduct was not serious enough to warrant termination. In this regard, the Magistrate Judge erroneously substituted his judgment for that of Defendants." (Objections at 9–10.) Defendants state that if an employer provides a legitimate, nondiscriminatory reason for discharging Plaintiff, it is not the court's "province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (*Id.* at 10.)

Defendants are correct that if an employer provides a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not the province of the courts "to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.2000). The case is not over, however, simply because Defendants present evidence of a legitimate, nondiscriminatory reason for discharging Plaintiff. Rather, the burden shifts back to the Plaintiff to establish "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Magistrate Judge determined that although Defendants had set forth an alleged legitimate non-pretextual reason for terminating Clark, "it appears that Clark has produced enough evidence to allow a reasonable fact finder to conclude that the defendants' reason is pretextual and that the real reason for the firing was race based animus." (R & R at 20.) Presumably Defendants object to this determination.

A plaintiff's own beliefs of perceived discrimination are not sufficient to overcome a defendant's evidence of legitimate, nondiscriminatory reasons for an adverse personnel decision. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir.1989). To show that a reason proffered by an employer is a pretext for discrimination, the employee may show that the "proffered reason is not worthy of belief." *Williams v. Staples, Inc.*, 372 F.3d 662, 669 (4th Cir.2004); *see also Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir.2004) (noting that a plaintiff can prove pretext by showing the explanation is "unworthy of credence" or by offering "other forms of circumstantial evidence sufficiently probative" of age discrimination). In establishing pretext, a plaintiff may rely on the evidence used to establish his or her *prima facie* case. *Williams v. Staples*, 372 F.3d at 669. "The existence of mendacity is of particular weight," and "[c]ourts have considered incorrect reasons for termination when coupled with other evidence to show the disingenuousness of the proffered reason for termination." *Badgett v. Fed. Express Corp.*, 378 F.Supp.2d 613, 628–29 (M.D.N.C.2005) (citations omitted).

The court agrees with the Magistrate Judge; Plaintiff has produced sufficient evidence to posit a genuine issue of material fact regarding whether Defen-

dants' proffered reason for firing her is worthy of belief. Considering the evidence in the light most favorable to Clark, she has produced evidence that she followed Magnolia Manor's abuse reporting policy and that she reported the abuse allegation the same way she had always done. Furthermore, while Ivey asserts that the policy requiring immediate reporting meant that Clark should have called him to report the abuse allegation, Clark presented evidence that she did not have his phone numbers.[8] The record also contains evidence that a white employee, Sally Cully, did not report abuse pursuant to the policy but was not terminated. While Defendants make much of the fact that Longto, a white employee, was also fired for failing to immediately report an allegation of abuse, such evidence does not negate the evidence concerning Ms. Cully's failure to report. Furthermore, comparing Plaintiff's termination to Longto's termination is difficult because while records indicate Longto was fired for failing to immediately report the abuse allegation, she (unlike Clark) also lied about it. There is evidence of racial tension at Magnolia Manor, including evidence that white employees were not disciplined as harshly as black employees. (*See* Pl.'s Resp. in Opp'n Ex. E.) The court thus finds that there is a genuine issue of material fact regarding whether Defendants' proffered reason for firing Clarke was truthful. Accordingly, the court agrees with the Magistrate Judge that THI's and Trans Health's Motions for Summary Judgment must be denied with respect to Plaintiff's wrongful termination claim.

*CONCLUSION*

It is therefore **ORDERED,** for the foregoing reasons, that THI's and Trans Health's Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART.** Specifically, the court grants THI's and Trans Health's Motions for Summary Judgment on Plaintiff's claims of (a) illegal discharge in retaliation for her having engaged in an activity protected by Title VII, (b) hostile work environment on account of race, and (c) wrongful termination in violation of the public policy of South Carolina. The court denies THI's and Trans Health's Motions for Summary Judgment on Plaintiff's claim of wrongful termination on account of race in violation of Title VII and 42 U.S.C. § 1981.

**AND IT IS SO ORDERED.**

---

8. Defendants assert the evidence that Plaintiff did not have Ivey's cell phone number is not significant because Ivey deposed that department heads had the number and there is no evidence that Plaintiff asked Longto or another department head for this number. However, the court finds this evidence *is* significant because Plaintiff was a department head and deposed that she did not have his cell phone number. Furthermore, Plaintiff deposed that she reported the abuse allegation as she always had. If she reported the abuse as she always had and had not received Ivey's cell phone number, a jury could be persuaded that Plaintiff had no reason to ask for Ivey's number.