**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1272**

EMANUELLA NKEM NNADOZIE; PERPETUA EZEH; SUNDAY AINA,

       Plaintiffs – Appellants,

   v.

GENESIS HEALTHCARE CORPORATION; GENESIS HEALTHCARE, LLC;
GENESIS ELDERCARE NETWORK SERVICES, INC.; 9109 LIBERTY ROAD
OPERATIONS, LLC, d/b/a Randallstown Center, d/b/a Patapsco Valley Center,

       Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.  (1:14-cv-02694-RDB)

Argued:  January 25, 2018                      Decided:  April 17, 2018

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by unpublished opinion.
Judge Wynn wrote the opinion, in which Judge Keenan and Judge Harris concurred.

**ARGUED:**  Leizer Z. Goldsmith, GOLDSMITH LAW FIRM, LLC, Washington, D.C.,
for Appellants.  Darryl G. McCallum, SHAWE & ROSENTHAL, LLP, Baltimore,
Maryland, for Appellees.  **ON BRIEF:**  Elizabeth Torphy-Donzella, SHAWE &
ROSENTHAL, LLP, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

This appeal concerns an employment discrimination action brought by two nurses and a nursing assistant against their former employers. They alleged discrimination and retaliation on the bases of race and national origin, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The district court granted summary judgment for the employers on all counts. Although we mostly agree with the district court's disposition, the court erred by mischaracterizing Plaintiff Perpetua Ezeh's two discriminatory hostile work environment claims—one on account of her race, in violation of Section 1981, and the other on account of her national origin, in violation of Title VII. Accordingly, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

I.

Patapsco Valley Center ("the Center") is a long-term nursing care facility located in Randallstown, Maryland. The Center is managed by Defendant-Appellee Genesis Eldercare Network Services, Inc. ("Genesis") and staffed by Defendant-Appellee 9109 Liberty Road Operations, LLC ("Liberty Road," and collectively with Genesis, "Defendants").

In late 2010, the Center was in a troubled state. During an August on-site investigation, the Maryland Department of Health and Mental Hygiene discovered several compliance problems. The Department thereafter imposed on the Center a monetary civil penalty and threatened to revoke its operational license. In response, Genesis installed new

3

management at the Center by hiring Mary Hochradel ("Hochradel") as Administrator and Denise Zimmerman ("Zimmerman") as Director of Nursing. The new managers were told they were coming aboard "a poor performer," and their job was to "turn it around" by evaluating staff and, if necessary, taking corrective action. J.A. 530–37.

Plaintiffs Emanuella Nkem Nnadozie ("Nnadozie"), Perpetua Ezeh ("Ezeh"), and Sunday Aina ("Aina," and collectively with Nnadozie and Ezeh, "Plaintiffs") are former Center employees who worked under Hochradel and Zimmerman. All are of African descent. Plaintiffs allege that, upon arriving at the Center, Zimmerman immediately created a severe and hostile work environment and engaged in several acts of invidious discrimination. Despite commonalities among their claims, Plaintiffs proceed individually.

A.

Plaintiff Nnadozie, a registered nurse, was born in Sierra Leone and raised in Nigeria. Notwithstanding her history of alleged poor performance at another Genesis-managed care center, Nnadozie applied for and was granted a transfer to the Center in September 2009. She assumed work as a Unit Manager and Assistant Director of Nursing, supervising the Center's subacute unit. Between September and October of 2010, the Center issued Nnadozie an "Individual Performance Improvement Plan," instructing her to improve her accountability, timeliness, and quality of patient care.

Tensions increased between Nnadozie and Center management after Zimmerman's arrival. Nnadozie claims that Zimmerman pressured her to discipline African staff while preventing her from disciplining white staff. Moreover, Nnadozie and Zimmerman

4

repeatedly argued over Nnadozie's work performance. During one dispute, Zimmerman allegedly raised her hand to Nnadozie's face and told her to "shut up." J.A. 1284, 1770.

In January 2011, Zimmerman instituted a new attendance policy that required all Assistant Directors of Nursing in charge of units, like Nnadozie, to begin their shifts at 7:00 a.m. Nnadozie asked to be excused from this requirement, but management denied her request. Around that same time, Zimmerman assigned Nnadozie to oversee the Center's dementia unit, in addition to her normal duties, and moved Nnadozie's office to the Center's basement—a location closer to the dementia unit.

Things came to a head when, after a dispute between Nnadozie and the Center's medical director over patient care, Zimmerman issued Nnadozie a "Final Written Warning" on February 1, 2011. *Id.* at 1796. Three days later, Nnadozie resigned.

In May 2011, Nnadozie filed an Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination by Zimmerman and Hochradel on the bases of race and national origin. After investigation, a formal Charge of Discrimination followed on April 5, 2012. Nnadozie now brings claims of constructive discharge, hostile work environment, and retaliation under both Section 1981 and Title VII. However, although Nnadozie's EEOC filings alleged discrimination on the bases of race and national origin, her complaint alleged discrimination on the basis of national origin only. *See id.* at 35–40.

B.

5

Plaintiff Ezeh is a registered nurse from Nigeria. Before working at the Center, Ezeh worked for another Genesis-affiliated employer, Genesis Staffing, LLC. In April 2010, the Center hired her as an Assistant Director of Nursing for its dialysis unit.

Soon after Ezeh's arrival, but before the leadership transition, Center management began complaining of Ezeh's lack of preparedness. As a result, Ezeh was issued an "Individual Performance Improvement Plan" in September 2010. *Id.* at 1039. The Plan stated that Ezeh had exhibited "poor performance" and insisted that she improve her caregiving. *Id.* at 1040.

On June 10, 2011, Ezeh emailed the Center's human resources manager to complain about "disrespect and insults" she had received from her new supervisor, Zimmerman. J.A. 1583. Later that month, Zimmerman gave Ezeh a "Management Performance Appraisal," in which she rated Ezeh's management, interpersonal, and communication skills as "marginal," indicating Ezeh's performance was "below what is expected" and fell "short of desired results." *Id.* at 1050–51. A few weeks later, Ezeh took health leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. At the start of her leave, Ezeh contacted the Genesis Corporate Hotline to complain again about ill-treatment from Zimmerman. Ezeh also wrote to Genesis complaining of "persecution and inequitable treatments based on color, race[,] national origin, and age," *id.* at 737, and claimed that "foreign nurses are denied work [at the Center] for no other reason except their [n]ationality," *id.* at 738.

Following her medical leave, Ezeh met with Zimmerman, Hochradel, and a Genesis human resources manager to discuss going back to work. Rather than return to the Center,

6

Ezeh informed the Center that she would instead seek a transfer back to her former employer, Genesis Staffing. Citing various infractions, Genesis refused to rehire her at either site.

On February 4, 2012, Ezeh filed an EEOC Charge of Discrimination alleging national origin discrimination and retaliation. Ezeh now brings claims of a hostile work environment, retaliatory termination, and other retaliation on the bases of both race and national origin under Section 1981 and Title VII.

As additional support for her charges, Ezeh alleges that, sometime between April and July 2011, Zimmerman told Ezeh that she believed "Africans [were] going to kill" her or make her "sick" by "putting voodoo on [her]." *Id.* at 1759. According to Ezeh, Zimmerman kept a "voodoo catcher" in her office for protection and would perform a "ritual in front of her door" before going inside. *Id.* Ezeh also claims that Zimmerman screamed in her face on at least two occasions, spoke to her inappropriately, and commented that there were "too many Nigerians," both at the Center and in her class at Baltimore City Community College, where Zimmerman worked as a teacher. *Id.* at 1591, 1797.

Another former Center employee, Robin Ross ("Ross"), testified that voodoo was indeed a "big thing" for Zimmerman, *id.* at 1075, and that Zimmerman would "often make comments about how she didn't like the Africans and wanted them all out of the building," *id.* at 1079. In September 2011, Ross sent an email to Genesis's corporate headquarters expressing concern about Zimmerman's alleged request to help her "get rid of the African people at Genesis." *Id.* at 1124.

7

C.

Finally, Plaintiff Aina, born in Nigeria, began working as a geriatric nursing assistant at the Center in February 2009. Aina received disciplinary warnings from his supervisors almost immediately. Afterwards, Aina continued to have problems at work. In June 2011, he was issued a "Final Written Warning" and suspended without pay for allegedly failing to take proper care of a resident. *Id.* at 1799. Believing he had done nothing wrong, Aina disputed his suspension and filed an Intake Questionnaire with the EEOC, alleging discrimination on the basis of national origin. When Aina returned to the Center post-suspension, Hochradel allegedly said that she wanted to fire him because "they have a lot of Africans here." *Id.* at 1628. Aina eventually was fired after failing to report a bruise on a patient's face.

Months after being terminated, Aina filed a Charge of Discrimination with the EEOC, alleging his prior suspension was motivated by national origin discrimination. Aina now brings claims of a hostile work environment, retaliatory termination, and other retaliation on the basis of national origin, under Section 1981 and Title VII.

D.

On January 31, 2017, the district court granted summary judgment for Defendants on all counts. In so doing, the district court construed all of Plaintiffs' allegations as being based solely on their national origin as "Africans" or "Nigerians," and not on any "specific ethnic characteristic" that might reasonably fall under a broad understanding of race, as opposed to national origin. *Id.* at 1802. Because Section 1981 "prohibits discrimination on the basis of race, but . . . does not bar discrimination purely on the basis of national

8

origin," the district court concluded that all of Plaintiffs' Section 1981 claims failed. *Id.* at 1801 (internal quotation marks omitted). For that reason, the district court only analyzed Plaintiffs' Title VII claims, disposing of each for failure to either present a triable issue of material fact or exhaust the available administrative remedies. Accordingly, the court entered judgment in favor of the Defendants. Plaintiffs timely appealed.

## II.

"We review de novo the district court's grant of summary judgment." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016). "Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). In reviewing a motion for summary judgment, the court "cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015). In other words, "[s]ummary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Id.* at 568 (internal quotation marks omitted).

## A.

We begin, as the district court did, with Plaintiffs' claims under Section 1981. Section 1981 provides in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue,

be parties, give evidence, and to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Although Section 1981 does not explicitly use the word "race," the Supreme Court has construed the statute to ban all racial discrimination in the making of public and private contracts. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (citing *Runyon v. McCrary*, 427 U.S. 160, 168, 174–75 (1976)). This includes race-based employment discrimination. *See Yashenko v. Harrah's NC Casino Co.,* 446 F.3d 541, 551–52 (4th Cir. 2006).

For purposes of Section 1981, the concept of "race" is much broader than our modern understanding of the term. *See Saint Francis Coll.*, 481 U.S. at 609–13. As the Supreme Court detailed in *Saint Francis College*, in light of the legislative history of Section 1981 and prevailing mid-19th century notions about race, it is clear that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." *Id.* at 613 (emphasis added). This might be a "loose sense of the word 'race,' but the loose sense is the right one to impute to a race statute passed in 1866." *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008). Putting this understanding into practice, other circuits have found that Section 1981 protects against discrimination based on being Jewish, *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 474–75 (1st Cir. 1993), "Middle Eastern," *Amini v. Oberlin Coll.*, 259 F.3d 493, 503 (6th Cir. 2001), or Iranian, *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 757 (7th Cir. 2006). Similarly, with evidence of some nexus

10

between ethnic or ancestral characteristics and workplace discrimination, there is no reason why a plaintiff cannot bring a Section 1981 claim on the basis of being "African" or "Nigerian."

Still, the scope of Section 1981 protection is not unlimited. It is true that "the line between discrimination based on ancestry or ethnic characteristics and discrimination based on place or nation of . . . origin is not a bright one." *Saint Francis Coll.*, 481 U.S. at 614 (Brennan, J. concurring) (internal quotation marks and citations omitted). Trying to draw clear distinctions between someone's ethnicity and national origin can often amount to impossible hairsplitting. In some instances, evidence of discrimination based on national origin may even be "identical as a factual matter" to discrimination based on ethnicity or ancestry. *Id.* However, at the very least, a Section 1981 claim must allege *race*-based discrimination. *See, e.g., Torgerson v. City of Rochester*, 643 F.3d 1031, 1053 (8th Cir. 2011) (en banc) (dismissing Section 1981 claim where plaintiff pleaded discrimination on the basis of national origin only); *El-Zabet v. Nissan N. Am.*, *Inc.*, 211 F. App'x 460, 462–63 (6th Cir. 2006) (per curiam) (same); *see also* Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief *must* contain . . . a short and plain statement of the claim *showing that the pleader is entitled to relief*." (emphasis added)). In other words, allegations of discrimination based purely on national origin are insufficient to state a Section 1981 claim.

Here, neither Nnadozie nor Aina alleged race-based discrimination in their complaint. Instead, both plaintiffs alleged discrimination on the basis of *national origin* alone. *See* J.A. 35–45. To escape this otherwise fatal defect in their complaint, Plaintiffs argue that "[a] Section 1981 'national origin' discrimination claim not directly identifying

11

a 'race' basis by name can be legally sufficient." Appellant's Br. at 23. But courts have dismissed Section 1981 claims when a plaintiff fails to allege discrimination based on race, ancestry, or ethnicity.[1] *See, e.g., Torgerson*, 643 F.3d at 1053; *El-Zabet*, 211 F. App'x at 462–63; *Ana Leon T. v. Fed. Reserve Bank of Chi.*, 823 F.2d 928, 931 (6th Cir. 1987) (per curiam). Because Nnadozie and Aina have failed to allege race-based discrimination under Section 1981, we agree with the district court's dismissal of their Section 1981 claims.

That being said, we disagree with the district court's decision to dismiss those claims *with prejudice*. Below, the district court concluded that Plaintiffs' Section 1981 claims fail as a matter of law, thereby entitling Defendants to summary judgment and warranting dismissal with prejudice. In so doing, however, it is unclear whether the district court looked to the summary judgment record or solely considered the adequacy of the allegations in the complaint. Specifically, in dismissing Plaintiffs' Section 1981 claims, the district court neither cited nor referenced any evidence contained in the record. To the contrary, the district court's opinion referenced only the allegations made by Plaintiffs in their *complaint*. Because the extent to which the district court may have relied on evidence

---

[1] Plaintiffs cite one out-of-circuit case for this misguided contention, *Abdullahi v. Prada USA Corp.*, 520 F.3d 710 (7th Cir. 2008). There, the Seventh Circuit reversed the district court's dismissal of a *pro se* plaintiff's Section 1981 claims. The plaintiff's original complaint had alleged discrimination on the basis of race, but the amended complaint did not. *Id.* at 711–13. Finding it rather "unlikely" that the plaintiff's omission was intentional, and "bearing in mind her *pro se* status," the Seventh Circuit concluded that the district court was "premature" in dismissing the plaintiff's Section 1981 claim. *Id.* at 712. At best, *Abdullahi* amounts to an unusual and case-specific diversion from normal pleading requirements.

outside of the parties' pleadings is unclear, we think it best to treat the district court's disposal of Plaintiffs' claims as a judgment on the pleadings. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969); *Rutherford v. United States*, 702 F.2d 580, 581 n.1 (5th Cir. 1983). Moreover, because the district court's analysis rested solely on the adequacy of the allegations in Plaintiffs' complaint, and in light of the Supreme Court's expansive definition of "race" under Section 1981, we think it best to vacate the order of dismissal with prejudice and remand the case to the district court. On remand, the court should determine whether the inadequacy of Plaintiffs' pleadings could be cured through amendment, thus rendering dismissal *without* prejudice appropriate.

We also disagree with the district court's conclusion that Ezeh, in particular, did not allege race-based discrimination with respect to her hostile work environment claim under Section 1981. For purposes of both Section 1981 and Title VII claims, a hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted). Thus, to prevail on a hostile work environment claim under Section 1981, a plaintiff must show that there is "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). Viewed in the light most favorable to Ezeh, we believe that the evidence in the record could allow a rational factfinder to

13

conclude that Ezeh endured unwelcome conduct, based on her race, that was severe or pervasive enough to constitute a hostile work environment, and that such conduct is imputable to her employer.

Unlike Nnadozie and Aina, Ezeh *does* allege discrimination on the basis of race in her complaint. Moreover, Ezeh assembles the following evidence in support of her hostile work environment claim: (1) Ezeh's own sworn testimony alleging that Zimmerman made statements that Africans were plaguing her with voodoo, (2) sworn testimony alleging Zimmerman screamed in her face; (3) Ross's sworn testimony alleging that Zimmerman routinely instructed Ross to "get rid of the Africans"; and (4) Ross's testimony that Zimmerman mainly screamed at African nurses. Whether this evidence supports an objectively hostile or abusive environment is "judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto*, 786 F.3d at 277 (internal quotation marks omitted). In making this evaluation, we must consider a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris*, 510 U.S. at 23.

The district court concluded that Ezeh's claims were not based on any "specific ethnic characteristics associated with" being African or Nigerian that could fit under Section 1981's broad umbrella. J.A. 1801. We disagree. Ezeh's evidence, if found credible by a factfinder, shows that Zimmerman stereotyped her African employees as voodoo practitioners, which, in conjunction with her other evidence, provides a basis for finding discrimination based on ethnicity or ancestry, and, therefore, on race.

14

Defendants argue that because "voodoo is a *religion,* which . . . is also practiced in places such as Canada, the nations of the Caribbean and the United States," this evidence cannot form part of a Section 1981 claim. Appellee's Br. at 27. But shared religious practice can be a facet of ethnic or ancestral identity. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (reversing court of appeals dismissal of plaintiffs' claim based upon plaintiffs' status as Jewish people). And the assumption, based on stereotype alone, that employees with shared ancestry also share a common religious practice is exactly the type of broad-brush appraisal suggesting an ethnic characterization. As such, the combination of the alleged voodoo commentary and hostility towards African employees provides a basis for a reasonable jury to conclude that Ezeh endured unwelcome, race-based conduct from her supervisor that was pervasive and severe.[2]

The district court, citing our opinion in *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004), discounted Ezeh's sworn deposition testimony as "self-serving opinions," insufficient to establish a case of discrimination. J.A. 1815. We, however, find *Mackey* inapposite. There, a federal employee, Mackey, brought a sex discrimination claim against the Department of Health and Human Services ("HHS") after being passed over for a

---

[2] On similar facts, the U.S. District Court for the District of Maryland reached the same conclusion in *Mandengue v. ADT Security Systems, Inc.,* No. ELH-09-3103, 2012 WL 892621 (D. Md. March 14, 2012). There, the plaintiff—a black woman of Cameroonian origin—filed suit against ADT Security Systems, alleging, *inter alia*, that she was subjected to a hostile work environment on the basis of race, in violation of Section 1981. *Id.* at *29 n.34. In denying summary judgment to ADT, the district court relied on the plaintiff's sworn testimony in which she alleged that her ADT supervisor had suggested that she was performing "voodoo" or "witchcraft" on customers and remarked that she should "go back to Cameroon." *Id.* at *28.

15

managerial position and reassigned, allegedly in retaliation for having filed EEOC complaints. *Id.* at 466–67. The only connection between Mackey's EEOC complaints and the alleged retaliation, however, was her own speculation that she had been reassigned for voicing her complaints. Thus, in affirming the district court's entry of judgment in favor of HHS, we noted that "[a] plaintiff's own self-serving *opinions*, absent anything more, are insufficient to establish a *prima facie* case of discrimination." *Id.* at 469–70 (first emphasis added) (citing *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988)).

In contrast to Mackey's unadorned opinion as to the basis for her discrimination, Ezeh has presented testimony replete with alleged *facts* about the work environment at the Center and her supervisors' behavior. That Ezeh's allegations lack extensive corroborating evidence is of little import, because the volume of corroborating evidence "relates only to the credibility and weight of the evidence, which are issues for *the jury.*" *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004) (emphasis added); *see also United States v. Stein*, 881 F.3d 853, 856 (11th Cir. 2018) (en banc) ("Nothing in Rule 56 prohibits an otherwise admissible affidavit from being self-serving. And if there is any corroboration requirement for an affidavit, it must come from a source other than Rule 56."); *Payne v. Pauley*, 337 F.3d 767, 772–73 (7th Cir. 2003) (explaining same). And, in any event, the district court completely ignored Ross's testimony, which corroborated Ezeh's testimony about Zimmerman's mistreatment of African employees and obsession with voodoo. As we have previously explained, "comments made to others are also relevant to determining whether [a plaintiff] was subjected to severe or pervasive . . . harassment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 317 (4th Cir. 2008) (internal

16

quotation marks omitted). Because there are genuine disputes of material fact present in the record, a jury—not the court—should decide whether Ezeh was subjected to a hostile work environment. Thus, we conclude that the district court erred in granting summary judgment to Defendants on Ezeh's discriminatory hostile work environment claim under Section 1981.

Finally, although the district court scrutinized Ezeh's *retaliatory* hostile work environment claim under Title VII only, we agree with the district court's assessment of that claim and find it equally applicable to Ezeh's retaliation claim under Section 1981. *See Guessous v. Fairview Prop. Invs., LLC,* 828 F.3d 208, 217 (4th Cir. 2016) (explaining that elements to establish *prima facie* claim of retaliation under Title VII and Section 1981 are identical). To make out a *prima facie* case of retaliation, an employee "must show (i) that she engaged in protected activity; (ii) that her employer took adverse action against her; and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Id.* (internal brackets omitted). On the evidence in the record, Ezeh has failed to demonstrate any causal link between activity protected under Section 1981 and an adverse employment action. Ezeh argues that her receipt of a negative performance evaluation less than a month after sending Genesis management an email complaining about Zimmerman's alleged discrimination amounts to an adverse employment action that would not have occurred but for her allegation of discrimination. However, Ezeh's history of poor work performance rebuts such a conclusion. In particular, the record is undisputed that Genesis management had discussed Ezeh's substandard job performance at least two weeks *prior to* Ezeh's protests. And, as mentioned above, Ezeh

17

had been told that her performance was substandard even before Zimmerman arrived at the Center. Accordingly, Defendants are entitled to summary judgment on Ezeh's retaliatory hostile work environment claims. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("Workers are shielded from retaliation on account of their assertion of rights protected under Title VII. But a complaining worker is not thereby insulated from the consequences of insubordination or poor performance."). [3]

B.

We now shift to Plaintiffs' claims under Title VII, beginning with Aina's. [4] The only Title VII claim Aina raised on appeal—discriminatory termination on the basis of national origin—fails. As the district court correctly found, Aina cannot maintain this cause of action under Title VII because he failed to mention any facts related to his

---

[3] With respect to Ezeh's race-based discrimination claims arising out of her alleged termination, we also agree with the district court's conclusion that Ezeh was not, in fact, terminated. Ezeh's own resignation letter, dated October 28, 2011, states that she wanted to leave the Center and return to her old employer, Genesis Staffing, due to Zimmerman's "unvarying directive to arrive at 7am," which she found "unfeasible." J.A. 1059, 1817–18. We therefore agree with the district court that, having failed to make out a *prima facie* case of discriminatory or retaliatory termination, summary judgment on Ezeh's termination claims is appropriate. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004).

[4] We note that Plaintiffs have waived any right to challenge on appeal the district court's dismissal of several of their claims, given that Plaintiffs have failed to raise such challenges in their opening brief to this Court. *See Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) ("The doctrine of waiver derives from the Federal Rules of Appellate Procedure, which require that the *argument section* of an appellant's opening brief contain the 'appellant's contentions and the reasons for them, *with citations to the authorities and parts of the record* on which the appellant relies.'" (emphasis added) (quoting Fed. R. App. P. 28(a)(8)(A))). Accordingly, this opinion addresses only the claims properly before us.

18

termination in his EEOC Charge of Discrimination. This Court has explained that "[a]n individual alleging discrimination in violation of Title VII must first file an administrative charge with the EEOC." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C § 2000e-5(e)). The charge must "describe generally the action or practices complained of," *id.* at 509 (quoting 29 C.F.R. § 1601.12(b) (2004)), so as to provide adequate notice to the charged party, *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013). Although this Court construes EEOC charges liberally, our liberal construction only stretches so far. For instance, "[a] claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits." *Chacko*, 429 F.3d at 509. Accordingly, "[t]he filing of an administrative charge is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Id.* at 510. Because Aina's Charge of Discrimination lacks any reference to his alleged discriminatory termination, he has failed to exhaust his administrative remedies as required by Title VII. Thus, the district court correctly granted summary judgment on Aina's Title VII termination claim.

The Title VII claims Nnadozie raises on appeal also flounder. First, the district court rightly found that Nnadozie has failed to raise a triable issue of fact regarding her discriminatory hostile work environment claim. In particular, Nnadozie failed to adduce evidence sufficient to support an inference of discrimination on the basis of national origin, much less clear the "high bar" that is required to satisfy the "severe or pervasive" test. *Sunbelt Rentals*, 521 F.3d at 315. As this Court has explained, "complaints premised on

19

nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor . . . are not actionable under Title VII." *Id.* at 315–16 (internal citations, brackets, and quotations marks omitted). Nnadozie's allegations of poor performance evaluations, workplace disagreements with Zimmerman, an additional workload, and an office relocation simply cannot demonstrate an environment "permeated with discriminatory intimidation" on account of her national origin. *Harris*, 510 U.S. at 21 (internal quotation marks omitted).

Second, Nnadozie has not established a *prima facie* case of retaliation. Because Nnadozie has failed to demonstrate a causal connection between the protected activities she may have engaged in and any subsequent adverse treatment, she cannot prevail on her retaliatory hostile work environment claim under Title VII. *See Ziskie*, 547 F.3d at 229. Nnadozie argues that her objection to Zimmerman's alleged targeting of African employees was so close in time to her "Final Written Warning" and office relocation that those actions must have been retaliatory. Appellant's Br. at 39–41. But, as with Ezeh, Nnadozie's prior history of negative performance evaluations fatally weakens this slim temporal connection. No rational factfinder could conclude that Nnadozie's objections were the *but for* cause of any adverse employment action she may have experienced. Accordingly, summary judgment for Defendants is warranted.

Third, because Nnadozie cannot maintain a hostile work environment claim, the district court properly dismissed her claims of constructive discharge. Although hostile work environment claims are assessed under a "severe and pervasive" standard, constructive discharge claims are evaluated under an objective "intolerability" standard,

20

requiring a plaintiff to prove "circumstances of discrimination so intolerable that a reasonable person would resign." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016)). The "intolerability" standard governing constructive discharge claims is more stringent than the "severe and pervasive" standard for hostile work environment claims. *See Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995) (explaining that hostile work environment claims require "less severe" conditions vis-á-vis the intolerable conditions necessary for constructive discharge claims); *see also Spencer v. Wal-Mart Stores*, *Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (same); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (same); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) (same). Having failed to show hostile conditions that were severe and pervasive, Nnadozie similarly cannot show that conditions at the Center were intolerable. Accordingly, the district court properly granted summary judgment to the Defendants on these claims.

We arrive, finally, at Ezeh's claims under Title VII. In support of her claim of discriminatory hostile work environment on the basis of national origin, Ezeh relies on the same evidence underlying her Section 1981 discriminatory hostile work environment claim on the basis of race. *See supra* Part II-A. We find that this evidence is, likewise, sufficient for a reasonable jury to find that Ezeh experienced a hostile work environment on account of her national origin. It may seem peculiar that the same evidence can underlie both a race-based Section 1981 claim and a national-origin-based Title VII claim. However, because the line between ethnicity and national origin is, once again, "not a bright one," materials showing that Ezeh was discriminated against for being "African" can fairly

21

support either claim. *See Saint Francis Coll.*, 481 U.S. at 614 (Brennan, J., concurring) (noting that, in the Title VII context, national origin, ethnicity, and ancestry often "overlap as a legal matter"); *Guessous*, 828 F.3d at 225–26 (concluding that district court "put itself in the place of the jury" when it determined that comments made by plaintiff's supervisor evinced animus based on national origin and religion only, because jury could conclude that such comments were *also* "motivated by broader ethnic animus"); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) ("[C]laims based on race and national origin may substantially overlap or even be indistinguishable depending on the specific facts of a case." (internal quotation marks omitted)).

Defendants are entitled, however, to summary judgment on Ezeh's remaining Title VII claims. Specifically, Ezeh's decision to resign from the Center nullifies her wrongful termination claims, and, as discussed above, her retaliation claims fail because she has not demonstrated a causal relationship between a protected activity and any adverse employment action she allegedly suffered. Lastly, having checked only the "national origin" box on her EEOC Charge, Ezeh's race-based claims under Title VII are foreclosed for failure to exhaust administrative remedies.

III.

In sum, we agree with the district court's dismissal of Nnadozie and Aina's Section 1981 claims, but vacate and remand the dismissal insofar as the claims were dismissed *with* prejudice. We conclude that the district court erred in dismissing Ezeh's Section 1981 claims, as she has sufficiently alleged discrimination on the basis of race. However, we

22

nonetheless conclude that summary judgment is appropriate for Defendants on all but one of her claims under Section 1981; we reverse the district court's grant of summary judgment on Ezeh's race-based hostile work environment claim. And finally, we affirm the district court's grant of summary judgment to Defendants on of all but one of Plaintiffs' Title VII claims; we reverse the district court's grant of summary judgment on Ezeh's hostile work environment claim on the basis of national origin under Title VII. For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED*

*FOR FURTHER PROCEEDINGS*.